No. 19-5427

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

———————

## CAPITAL CASE

———————

WILLIAM GLENN ROGERS,

Petitioner-Appellant,

v.

TONY MAYS, Warden,

Respondent-Appellee.

———————

On Appeal from the United States District Court for the
Middle District of Tennessee (No. 3:13-cv-00141)

---

## PETITION FOR REHEARING EN BANC

---

HERBERT H. SLATERY III
*Attorney General and Reporter
of the State of Tennessee*

ANDRÉE S. BLUMSTEIN
*Solicitor General*

J. MATTHEW RICE
*Special Assistant to the Solicitor General*
P.O. Box 20207
Nashville, Tennessee
(615) 532-6026
matt.rice@ag.tn.gov

**TABLE OF CONTENTS**

RULE 35(B)(1) STATEMENT ..................................................... 1

INTRODUCTION .................................................................... 1

STATEMENT ........................................................................... 3

REASONS FOR GRANTING EN BANC REVIEW ................................ 9

   I.    The Panel Erroneously Extended the "Narrow"
       *Martinez v. Ryan* Exception ............................................. 9

   II.   The Panel Departed from Supreme Court and
       Circuit Precedent Applying § 2254 and *Strickland* ................... 15

CONCLUSION ........................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Cassano v. Shoop,*
 10 F.4th 695 (6th Cir. 2021) ...........................................3, 20

*Coleman v. Thompson,*
 501 U.S. 722 (1991) ..............................................................10

*Davila v. Davis,*
 137 S. Ct. 2058 (2017) ..............................10, 12, 14, 15

*Glossip v. Gross,*
 576 U.S. 863 (2015) .................................................................3

*Gobert v. Lumpkin,*
 2022 WL 980645 (W.D. Tex. Mar. 30, 2022) .......................13

*Harrington v. Richter,*
 562 U.S. 86 (2011) ......................................................*passim*

*Hodges v. Colson,*
 727 F.3d 517 (6th Cir. 2013) ................................................11

*Johnson v. Genovese,*
 2021 WL 3269954 (M.D. Tenn. July 30, 2021) ...................13

*Johnson v. Williams,*
 568 U.S. 289 (2013) ..............................................................16

*Martinez v. Ryan,*
 566 U.S. 1 (2012) .........................................................*passim*

*McCathern v. Lebo,*
 2021 WL 4428221 (M.D. Tenn. Sept. 24, 2021) ..................13

*McCleskey v. Zant,*
 499 U.S. 467 (1991) ..............................................................14

**Cases**

*Milam v. Davis,*
733 F. App'x 781 (5th Cir. 2018) .........................................................13

*Petty v. Hampton,*
2020 WL 3964207 (M.D. Tenn. July 13, 2020) ...................................13

*Porter v. Eppinger,*
2021 WL 3828113 (6th Cir. Aug. 27, 2021) ..................................16, 17

*Reese v. Liberty,*
2018 WL 442998 (D. Me. Jan. 16, 2018) ..............................................13

*Reid v. United States,*
2018 WL 11303655 (6th Cir. Aug. 28, 2018) .......................................13

*Richardson v. Superintendent Coal Twp. SCI,*
905 F.3d 750 (3d Cir. 2018) ..................................................................13

*Rogers v. Mays,*
814 F. App'x 984 (6th Cir. 2020) ............................................................7

*Rogers v. State,*
2012 WL 3776675 (Tenn. Crim. App. Aug. 30, 2012)......................7, 17

*Rogers v. Westbrooks,*
2019 WL 1331035 (M.D. Tenn. Mar. 25, 2019) ...............................7, 19

*Shinn v. Ramirez,*
142 S. Ct. 1718 (2022).....................................................................2, 12

*State v. Rogers,*
188 S.W.3d 593 (Tenn. 2006) .....................................................3, 4, 5, 6

*State v. Rogers,*
2004 WL 1462649 (Tenn. Crim. App. June 30, 2004) ...................1, 4, 5

*Strickland v. Washington,*
466 U.S. 668 (1984)...........................................................2, 8, 15, 18

**Page(s)**

**<u>Cases</u>**

*United States v. Sineneng-Smith,*
  140 S. Ct. 1575 (2020)..............................................................18

*Wetzel v. Lambert,*
  565 U.S. 520 (2012)..................................................................3

*White v. Wheeler,*
  577 U.S. 73 (2015)....................................................................9

**<u>Statutes</u>**

28 U.S.C. § 2254..........................................................................2, 15

**<u>Rules</u>**

Fed. R. App. P. 35 ......................................................................1

# RULE 35(B)(1) STATEMENT

The full Court should rehear this case to assure uniformity of Sixth Circuit law, to prevent the creation of a circuit split, and to assure faithful application of the Antiterrorism and Effective Death Penalty Act (AEDPA) in capital habeas cases. Fed. R. App. P. 35(b)(1)(A), (B).

# INTRODUCTION

Twenty-six years ago, nine-year-old Jacqueline ("Jackie") Beard left her house to pick blackberries. Tragically, this "friendly, happy, and well-liked child" never came home. *State v. Rogers*, 2004 WL 1462649, at *10 (Tenn. Crim. App. June 30, 2004) (*Rogers I*). Petitioner, William Rogers, stalked, kidnapped, raped, and murdered her.

A jury convicted Rogers and sentenced him to death for these crimes. In two decades of follow-on litigation, Rogers's convictions and sentence were upheld by state courts on appeal, upheld by state courts in post-conviction proceedings, and upheld by a federal district court on habeas review. But, after all that, a divided panel of this Court has vacated Rogers's sentence, engineering a new procedural pathway to consider defaulted claims and discarding AEDPA's demanding standards.

1

First, the panel's opinion improperly extended *Martinez v. Ryan*, 566 U.S. 1 (2012), to allow federal habeas review of a new class of procedurally defaulted claims: ineffective assistance of counsel in a motion for a new trial. That novel extension defies the Supreme Court's recognition that "*Martinez* [itself] foreclosed any extension of its holding beyond the 'narrow exception' to procedural default at issue in that case." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1737 (2022). Worse still, the panel departs from the rationale underlying *Martinez*'s exception, creating a split with the Fifth Circuit and expanding federal intrusion into state affairs.

Second, and independently, the panel's opinion misapplied 28 U.S.C. § 2254 and *Strickland v. Washington*, 466 U.S. 668 (1984). The panel applied the wrong standard of review—ditching AEDPA's deferential review for a de novo analysis. And it reached the wrong outcome—concluding that trial counsel's failure to sufficiently challenge semen evidence would have somehow affected the sentencing, even though the bases for challenge were speculative and the jury already knew that the semen evidence was inconclusive. This judicial second-guessing follows a trend of disregard for AEDPA's strictures—a trend

that has forced the Supreme Court to reverse this Court more than 20 times for erroneously granting habeas relief. *Cassano v. Shoop*, 10 F.4th 695, 696-97 (6th Cir. 2021) (Griffin, J., dissenting) (compiling cases).

Jackie's family has endured a marathon of litigation in hopes of obtaining finality. The panel's opinion, however, demands a new sentencing hearing nearly "three decades after the crime, posing the most daunting difficulties for the prosecution." *Wetzel v. Lambert*, 565 U.S. 520, 525 (2012) (per curiam). It would be one thing if a proper application of AEDPA required this resentencing and, as a result, created the risk of a lesser punishment. But AEDPA demands no relief here. And this Court should "not presume to tell parents whose life has been forever altered by the brutal murder of a child that life imprisonment is punishment enough." *Glossip v. Gross*, 576 U.S. 863, 897 (2015) (Scalia, J., concurring).

The full Court should intervene.

## STATEMENT

In 1996, just before the July 4th holiday, Rogers (then in his mid-thirties) approached Jackie and two other children as they played outside. *State v. Rogers*, 188 S.W.3d 593, 598 (Tenn. 2006) (*Rogers II*).

Rogers introduced himself (falsely) as an undercover police officer and invited the children swimming, offering them fireworks. *Id.* A few minutes later, Rogers left, but soon returned with fireworks. *Rogers I*, 2004 WL 1462649, at *2. This time, Rogers was greeted by Jackie's mother, Jeannie Meyer—who had come to watch over the children after learning that a man had approached them. *Id.* Rogers, again, introduced himself as an undercover officer and commended Ms. Meyer on finding out who he was because there are "a lot of sickos in the world." *Id.* Eventually, Ms. Meyer took the children home, and Rogers drove away. *Id.*

But Rogers returned to the Meyers' home five days later, asking about a lost key. *Id.* After Ms. Meyer turned Rogers away, he walked toward an abandoned trailer nearby. *Id.* A few minutes later, Jackie asked her mother if she could go pick blackberries before heading to an appointment. *Id.* at *3. Ms. Meyer initially refused but, after repeated requests, told Jackie that she could go outside if she changed her clothes. *Id.* Jackie changed into a Minnie Mouse T-shirt and clean shorts, and she headed out. *Id.* at *3, *18. Ten to fifteen minutes later, Ms. Meyer

walked outside and called for Jackie, but she was nowhere to be found. *Id.* at \*3. Ms. Meyer would never see her daughter alive again.

Law enforcement officers questioned Rogers after Jackie's disappearance. *Id.* at \*4. Initially, Rogers told officers that he had not seen Jackie on the day of her disappearance and that he had been home with his wife. *Id.* But that was a lie: Rogers's wife stated that her husband had not come home until after 6 p.m., and when he did, he had mud on his pants and blood on his shirt. *Id.* at \*3-4. Rogers's wife also explained that she noticed small fingerprints on the car's windshield and handprints that dragged down on the inside of the car window. *Id.* at \*3.

Rogers quickly changed his story. *Id.* at \*5-6. In a written statement, Rogers admitted that he saw Jackie on the day she disappeared and stated that he accidentally ran over her in his car and threw her body in the river. *Id.* at \*5. Then, when confronted about the possibility that Jackie's fingerprints were *inside* the car, he changed his story again. *Rogers II*, 188 S.W.3d at 599. This time, Rogers claimed that Jackie had gotten into his car for five minutes; after she got out of the car, he ran her over and dumped her body. *Id.*

Four months later, hunters discovered Jackie's body 48 miles from her home in a remote, wooded area. *Id.* at 599-600. Rogers had previously visited that same area with his family and commented "you could bury a body back here and nobody would ever find it." *Id.* at 600. Jackie's remains were scattered throughout the woods. *Id.* at 599-600. Her shirt had been turned inside out, and her shorts had human semen stains on the inside crotch. *Id.* at 600.

After a thorough trial, a jury convicted Rogers of first-degree premeditated murder, felony murder in the perpetration of a kidnapping, felony murder in the perpetration of a rape, especially aggravated kidnapping, rape of a child, and criminal impersonation. *Id.* at 601. At the sentencing phase, the jury found four aggravating circumstances: murder of a person less than twelve years old; prior felony convictions involving violence; murder for the purpose of avoiding arrest or prosecution; and murder committed when committing a rape or kidnapping. *Id.* at 604. The jury further found that these aggravating circumstances outweighed any mitigating circumstances. *Id.* Accordingly, the jury sentenced Rogers to death. *Id.*

Tennessee's Court of Criminal Appeals and Supreme Court affirmed Rogers's convictions and sentence on direct appeal. After an evidentiary hearing, state courts upheld the convictions and sentence again in post-conviction proceedings. *Rogers v. State*, 2012 WL 3776675, at *1 (Tenn. Crim. App. Aug. 30, 2012) (*Rogers III*).

Rogers then filed a federal habeas petition. Following further discovery, a federal district court (Crenshaw, C.J.) denied Rogers's habeas petition in a 206-page order. *Rogers v. Westbrooks*, 2019 WL 1331035 (M.D. Tenn. Mar. 25, 2019). The district court granted a certificate of appealability with respect to several issues, and a panel of this Court expanded the certificate to include additional claims. *Rogers v. Mays*, 814 F. App'x 984 (6th Cir. 2020).

On appeal, a panel of this Court affirmed in part and reversed in part. As relevant here, the panel held that "the *Martinez-Trevino* exception can excuse procedural default when the underlying claim relates to ineffective assistance of counsel at the motion-for-a-new-trial stage." Op. 41. The panel recognized that neither the Sixth Circuit nor the Supreme Court had applied *Martinez* in that context, *id.* at 39, and noted that "the Fifth Circuit and several district courts in this circuit

have arrived at the opposite answer," *id.* at 40. Undeterred, the panel extended *Martinez* to all ineffective-assistance claims before the filing of the notice of appeal. *Id.* at 41.

A majority of the panel (Moore, J., joined by Stranch, J.) also granted habeas relief based on trial counsel's failure to investigate and adequately question witnesses regarding the semen on Jackie's shorts. Conducting de novo review, the majority concluded that counsel's ineffective assistance satisfied *Strickland*'s prejudice requirement, necessitating a new sentencing hearing. *Id.* at 16-20.

Judge White dissented from this prejudice analysis. She explained that "the jury knew that the serology evidence was largely inconclusive and could not be directly tied to Rogers"—undermining the notion that additional challenges to that evidence would have affected the jury's sentence. *Id.* at 46. And she emphasized that, even without a rape conviction, "the jury would still have been confronted with the premeditated and calculating kidnapping and murder of a 9-year-old whose shirt had been removed and whose shorts contained sperm in the inside crotch." *Id.* at 45-46. On those facts, Judge White could not agree

"that the likelihood of a different penalty was 'substantial' but for counsel's errors." *Id.* at 46.

## REASONS FOR GRANTING EN BANC REVIEW

The Supreme Court has repeatedly emphasized the narrow scope of federal habeas review permitted under AEDPA and has repeatedly reminded the Sixth Circuit that AEDPA's provisions "apply with full force *even when reviewing a conviction and sentence imposing the death penalty*." *White v. Wheeler*, 577 U.S. 73, 81 (2015) (emphasis added). Yet, once again, a State is faced with a panel opinion that creates a novel exception to AEDPA's procedural bars and conducts a misguided, de novo analysis of an ineffective-assistance-of-counsel claim. Both issues warrant review by the full Court.

## I. The Panel Erroneously Extended the "Narrow" *Martinez v. Ryan* Exception.

The panel's opinion creates a new category of procedurally defaulted claims (claims for ineffective assistance in a motion for a new trial) that may be considered on federal habeas review. That extension of *Martinez* defies Supreme Court precedent, creates a circuit split, and generates tension with Sixth Circuit precedent.

As a general rule, a federal court cannot consider a state prisoner's habeas claim if it was not presented to a state court in accordance with state procedures. A prisoner may overcome that procedural bar if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). But "[a]n attorney error does not qualify as 'cause' to excuse a procedural default unless the error amounted to *constitutionally ineffective assistance of counsel*." *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017) (emphasis added). "Because a prisoner does not have a constitutional right to counsel in state postconviction proceedings, ineffective assistance in those proceedings [usually] does not qualify as cause to excuse a procedural default." *Id.*

In *Martinez*, the Supreme Court created a "narrow exception" to this rule. 566 U.S. at 9. If a prisoner fails to raise in the state court a claim for "ineffective assistance of counsel *at trial*," *id.* at 15, a federal court can consider that defaulted claim if state law requires prisoners to raise ineffective-assistance-at-trial claims in collateral proceedings, and the default occurs because state post-conviction counsel inadequately failed to present the claim, *id.* at 16-17. The Court rested its decision on,

among other things, the "bedrock" nature of the Sixth Amendment right to effective counsel during a criminal trial. *Id.* at 12. And the Court explicitly limited the scope of the "equitable" exception that it created, stating that the rule against consideration of procedurally barred claims "governs in *all* but the limited circumstances recognized here"—i.e., a claim of ineffective assistance of counsel *at trial*. *Id.* at 16 (emphasis added).

Disregarding the Supreme Court's explicit limitation circumscribing the applicability of *Martinez*, the panel in this case expanded the reach of the *Martinez* exception. The panel openly acknowledges that "[n]either the Sixth Circuit nor the Supreme Court" has applied "the *Martinez-Trevino* exception . . . when the underlying ineffective assistance occurred in a motion for a new trial," rather than during the trial itself. Op. 39. Yet it extended *Martinez* anyway.

That approach conflicts with this Court's previous holding that "the Supreme Court meant exactly what it wrote" in *Martinez*: the doctrine applies only with claims of "ineffective assistance of counsel *at trial*." *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013). And it flouts the Supreme Court's recent reiteration that "*Martinez* foreclosed any

extension of its holding beyond the 'narrow exception' to procedural default at issue in that case." *Ramirez*, 142 S. Ct. at 1737.[1]

The Supreme Court has been abundantly clear: attempts to "[a]pply[] *Martinez*'s highly circumscribed, equitable exception to new categories of procedurally defaulted claims" contradict precedent. *Davila*, 137 S. Ct. at 2065-66; *Ramirez*, 142 S. Ct. at 1737. The panel erred in failing to heed that instruction.

Even setting aside the Supreme Court's stated desire to cabin *Martinez*, the panel's opinion lacks merit. The Court, through *Martinez*, crafted an equitable exception to protect the "foundation[al]" "right to counsel," explaining that "[t]he right to the effective assistance of counsel *at trial* is a bedrock principle in our justice system." 566 U.S. at 12 (emphasis added). But "[t]he Supreme Court has never held that a hearing on a motion for a new trial is a critical stage of a criminal

---

[1] The opinion's disregard of *Ramirez* was not limited to its language on the scope of *Martinez*. Despite *Ramirez*'s holding that "a federal habeas court may not . . . consider evidence beyond the state-court record," the panel's opinion contains 15 pages of dicta based on evidence outside of the state-court record. *See* Op. 20-24, 26-37. While the panel ultimately did not base its ruling on this analysis, it could not "envision a just or humane system that, in the face of such . . . evidence, would provide no relief." Op. 26.

proceeding." *Reid v. United States*, 2018 WL 11303655, at *2 (6th Cir. Aug. 28, 2018).  And this Court has stated that "the motion for a new trial [i]s *not* a critical stage" of the criminal prosecution.  *Id.* (emphasis added). Thus, the rationale underlying *Martinez* and Sixth Circuit precedent undermine the panel's novel extension.

Unsurprisingly, a majority of courts to confront the question have declined to extend *Martinez* to cover claims of ineffective assistance on a motion for a new trial.  *See Milam v. Davis*, 733 F. App'x 781, 782, 786 (5th Cir. 2018); *Gobert v. Lumpkin*, 2022 WL 980645, at *18 (W.D. Tex. Mar. 30, 2022); *McCathern v. Lebo*, 2021 WL 4428221, at *14 (M.D. Tenn. Sept. 24, 2021); *Johnson v. Genovese*, 2021 WL 3269954, at *18 (M.D. Tenn. July 30, 2021); *Petty v. Hampton*, 2020 WL 3964207, at *17 (M.D. Tenn. July 13, 2020); *Reese v. Liberty*, 2018 WL 442998, at *12 (D. Me. Jan. 16, 2018).  The panel cited a single Third Circuit case in its favor, *Richardson v. Superintendent Coal Twp. SCI*, 905 F.3d 750 (3d Cir. 2018).  But that decision failed to engage with the Supreme Court's limitations on *Martinez* or the rationale for the exception.  *Id.* at 761-62.

And it is not just precedent weighing against the panel's opinion; equitable considerations counsel against extending *Martinez*.  For one,

the panel's expansion of *Martinez* "disturbs the State's significant interest in repose for concluded litigation . . . and intrudes on state sovereignty." *See Harrington v. Richter*, 562 U.S. 86, 103 (2011) (cleaned up). "[T]he doctrine[] of procedural default" is "designed to lessen the injury to a State that results through reexamination of a state conviction on a ground that the State did not have the opportunity to address at a prior, appropriate time"; it "seek[s] to vindicate the State's interest in the finality of its criminal judgments." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991). Extending *Martinez* erodes the respect that must be accorded to the State's sovereignty and interests in finality.

Moreover, "[e]xpanding the narrow exception announced in *Martinez* would unduly aggravate the 'special costs on our federal system' that federal habeas review already imposes." *Davila*, 137 S. Ct. at 2069-70. The panel failed to account for the "heavy burden" that "[f]ederal collateral litigation places . . . on scarce federal judicial resources, . . . threaten[ing] the capacity of the system to resolve primary disputes." *McCleskey*, 499 U.S. at 491. "Each [challenge to ineffective assistance in a motion for a new trial] would require the district court to review the prisoner's trial record, appellate briefing, and state

postconviction record to determine the claim's viability." *Davila*, 137 S. Ct. at 2069.

Put simply, the panel's extension of *Martinez* raises an issue of utmost importance that warrants full-Court review.

## II. The Panel Departed from Supreme Court and Circuit Precedent Applying § 2254 and *Strickland*.

Federal habeas review of state convictions exists only to "guard against extreme malfunctions in the state criminal justice systems." *Harrington*, 562 U.S. at 102 (quotation marks omitted). Unable to surmount the high AEDPA standard, the panel created a workaround, claiming that the state court failed to resolve an issue that *petitioner himself admits was resolved on the merits*. The panel then engaged in a de novo prejudice analysis that does not pass the straight-face test, let alone *Strickland*'s demanding standard. This egregious analysis needs further review.

**A.** The panel applied the wrong standard of review. Under AEDPA, if a state court adjudicates a claim on the merits, a federal court may not grant habeas relief unless the state's decision is (1) "contrary to, or . . . an unreasonable application of, clearly established Federal law" or (2) "based on an unreasonable determination of the facts." 28 U.S.C.

§ 2254(d). "If a claim . . . was not adjudicated on the merits in state court . . ., [this Court] review[s] the claim de novo." *Porter v. Eppinger*, 2021 WL 3828113, at *4 (6th Cir. Aug. 27, 2021).

But establishing the absence of merits review in state court is no easy task. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. Only if indisputable evidence "leads very clearly to the conclusion that [the] federal claim was inadvertently overlooked in state court" may a federal court review the claim *de novo*. *Johnson v. Williams*, 568 U.S. 289, 303 (2013).

Here, it is obvious that the Tennessee Court of Criminal Appeals did not "inadvertently overlook[]" Rogers's claim that trial counsel provided ineffective assistance with respect to the semen on Jackie's shorts. *See id.* Rogers's briefing to the state court on this issue focused on establishing trial counsel's deficiency. TCCA Br., Dist. Ct. Dkt. 26-14, Page ID# 9764-69. Rogers briefly addressed the prejudice from that deficiency but drew no distinction between the prejudices allegedly

suffered at the guilt and penalty phases. *Id.* The argument was simple: Rogers suffered prejudice because counsel could have further undermined the (already-inconclusive) semen evidence and thus undermined the proof of rape. *Id.,* Page ID# 9764 (noting that the semen evidence "was crucial to Mr. Rogers'[s] conviction of rape of a child and felony murder, and to the finding of the felony murder/rape aggravator in the penalty phase").

The Tennessee Court of Criminal Appeals addressed, and rejected, that argument. After reviewing the evidence, the court found that Rogers failed to "show[] that the defense would have been able to eliminate or completely discredit the State's proof that sperm heads were found in the crotch area of the victim's shorts" and thus, given the other evidence, Rogers could not undermine his rape conviction. *Rogers III*, 2012 WL 3776675, at *47. That conclusion directly addressed the prejudice argument Rogers had raised. And that conclusion not only undermined any prejudice at the guilt phase, it "necessarily negate[d]" any finding of prejudice at the penalty phase: if Rogers could not undermine the rape conviction at the guilt phase, he could not undermine the rape aggravator at the penalty phase. *See Porter*, 2021 WL 3828113, at *5. Thus, *as*

*Rogers himself admitted to this Court*, "the state court addressed this claim on the merits." Op. Br., DE 39 at 142 (Page ID# 165).

The panel's conclusory assertion to the contrary—and concomitant shift to de novo review—eschews governing precedent, mischaracterizes the state court's decision, and departs from the party-presentation principle. Op. 16; *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (reiterating the rule that the parties "are responsible for advancing the . . . argument entitling them to relief" (cleaned up)).

**B.** Even under de novo analysis, the panel reached the wrong outcome. Counsel's performance qualifies as prejudicial only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. And "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Here, the panel found that further undermining the semen evidence would have made all the difference for purposes of sentencing. Not so. "[N]o challenge Petitioner's counsel could have raised to the strength of the semen evidence would have refuted the fact . . . that there were visible sperm heads . . . from material on the inside of the victim's shorts."

*Rogers*, 2019 WL 1331035, at \*29.  Indeed, the sperm heads were found inside the *crotch* of Jackie's shorts.

To counter this evidence, the panel pointed to a single study finding that sperm could theoretically be transferred in a washing machine.  Op. 14-15.  The theory goes like this:  there *may* have been some article of clothing that *may* have contained someone else's sperm that *may* have been washed with the shorts that Jackie put on, and it *just so happened* that this sperm transferred to the inside crotch of those shorts.  There is no reasonable probability that the jury would have strung together such a chain of farfetched inference upon farfetched inference.

Moreover, even assuming additional evidence would have affected the rape conviction, "the jury would still have been confronted with the premeditated and calculating kidnapping and murder of a 9-year-old whose shirt had been removed and whose shorts contained sperm in the inside crotch—albeit from an unknown source."  Op. 45-46 (White, J., dissenting in part).  The jury knew that the serological evidence was inconclusive, *id.*, but it sentenced Rogers to death anyways.  It is not the panel's role to second-guess that judgment.

The erroneous grant of habeas relief "intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Harrington*, 562 U.S. at 103 (quotation marks omitted). The Supreme Court's use of its limited bandwidth to repeatedly reverse this Court's AEDPA opinions highlights the importance of this issue. *Cassano*, 10 F.4th at 696 (Griffin, J., dissenting). Rather than expand upon "a sad record" of AEDPA decisions, *id.*, the full Court should review the panel's opinion.

## CONCLUSION

The Court should grant the petition for rehearing en banc.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General & Reporter

ANDRÉE SOPHIA BLUMSTEIN
Solicitor General

/s/J. Matthew Rice
J. MATTHEW RICE
Special Assistant to the Solicitor General
P. O. Box 20207
Nashville, Tennessee 37202
(615) 532-6026
matt.rice@ag.tn.gov

Attorney for Respondent-Appellant

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the type-volume limitation set out in Fed. R. App. P. 35(b)(2)(A) because it contains 3892 words. This petition also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced typeface using Century Schoolbook 14-point font.

/s/J. Matthew Rice
J. MATTHEW RICE
Special Assistant to the Solicitor General

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 6 Cir. R. 25(f), I certify that a true and exact copy of this brief has been filed via the Court's electronic filing system on August 16, 2022. On the same date, a copy of this motion was served via the Court's electronic filing system to Kelley J. Henry, Federal Public Defender's Office, 810 Broadway, Suite 200, Nashville, TN 37203, and Kimberly S. Hodde, Hodde & Associates, 40 Music Square East, Nashville, TN 37203.

/s/J. Matthew Rice
J. MATTHEW RICE
Special Assistant to the Solicitor General

# APPENDIX

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0169p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

WILLIAM GLENN ROGERS,

              *Petitioner-Appellant*,

     *v.*

TONY MAYS, Warden,

              *Respondent-Appellee*.

No. 19-5427

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:13-cv-00141—Waverly D. Crenshaw, Jr., District Judge.

Argued: October 26, 2021

Decided and Filed: August 3, 2022

Before: MOORE, WHITE, and STRANCH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Kelley J. Henry, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. Richard D. Douglas, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Kelley J. Henry, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, Kimberly S. Hodde, HODDE & ASSOCIATES, Nashville, Tennessee, for Appellant. Richard D. Douglas, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

     MOORE, J., delivered the opinion of the court in which STRANCH, J., joined in full, and WHITE, J., joined in part. WHITE, J. (pp. 45–46), delivered a separate opinion dissenting from Sections II.B.3.b.2, II.C.1, and II.C.2.b.

---

### OPINION

---

KAREN NELSON MOORE, Circuit Judge.  A Tennessee jury convicted William Glenn Rogers of kidnapping, rape, and murder, and imposed a sentence of death.  Rogers appeals from the denial of his petition for a writ of habeas corpus by the United States District Court for the Middle District of Tennessee.  On appeal, Rogers raises claims related to sufficiency of the evidence and the state's limitation of evidence and cross-examination, as well as five groups of claims of ineffective assistance of counsel at the guilt/innocence, sentencing, and motion-for-a-new-trial stages.  For the reasons that follow, we affirm the district court's opinion with respect to the guilt/innocence phase of trial.  We conclude, however, that Rogers's counsel rendered ineffective assistance at the sentencing phase that makes us doubt whether this phase of trial produced a fair result.  We further hold that, in Tennessee, ineffective assistance of post-conviction counsel can establish cause to excuse a defendant's procedural default of a substantial claim of ineffective assistance at the motion-for-a-new-trial stage.  Accordingly, we **AFFIRM** in part, **REVERSE** in part, **VACATE** in part, and **REMAND** for further proceedings consistent with this opinion.

### I.  BACKGROUND

The Tennessee Supreme Court summarized the facts as follows:

> At the guilt phase of the trial, the State presented proof that on July 3, 1996, nine-year-old Jacqueline ("Jackie") Beard was playing with her twelve-year-old brother, Jeremy Beard, and her eleven-year-old cousin, Michael Carl Webber, at a mud puddle near her home in the Cumberland Heights area of Clarksville in Montgomery County.  The defendant, thirty-four-year-old William Glenn Rogers, approached the children and introduced himself as "Tommy Robertson."  He said he was an undercover police officer, offered the children fireworks, and invited them to go swimming.  Jackie went home and told her mother, Jeannie Meyer, about the man.  Mrs. Meyer took Jackie back to the mud puddle to investigate.  While the children played with the fireworks, Mrs. Meyer talked with Rogers, who continued to identify himself as undercover officer Tommy Robertson.  After approximately thirty-five minutes, Rogers left in his car.

At around 1:30 p.m. on July 8, 1996, Rogers appeared at the Meyer residence asking about a lost key. Jackie was with her mother when Mrs. Meyer spoke with Rogers. Rogers was last seen walking down the road toward a nearby abandoned trailer. A few minutes later, Mrs. Meyer gave Jackie permission to pick blackberries to take to the doctor's office where Mrs. Meyer had an appointment that afternoon. Jackie changed her shorts immediately before leaving the house. At 1:55 p.m., Mrs. Meyer was ready to leave and called for Jackie but could not find her. At around 2:00 p.m., a neighbor, Mike Smith, saw a car matching the description of Rogers' car leaving the immediate area. Smith had seen the same car heading in the direction of the Meyer residence about an hour or two earlier. Mrs. Meyer searched the area by car and on foot to no avail. Jackie was never seen alive again.

*State v. Rogers* ("*Rogers II*"), 188 S.W.3d 593, 598 (Tenn. 2006).

After Beard's disappearance, the police questioned Rogers. *Id.* at 599. At first, Rogers denied seeing Beard that day; later, he said that he accidentally struck her with his car and then threw her body off a bridge into the river. *Id.*; R. 25-5 (Tr. at 127–32) (Page ID #3894–99). After the police asked Rogers about a child's fingerprints in his car, he said that Beard briefly sat in his car and spoke with him. *Rogers II*, 188 S.W.3d at 599. Throughout police questioning, he denied any sexual abuse. *Id.*

On November 8, 1996, two deer hunters found Beard's remains in a wooded area in Land between the Lakes, approximately forty-eight miles from her home. *Id.* at 599–600. Her shoes, shirt, and shorts were near her remains. *Id.* The shirt was inside out. *Id.* at 600; R. 25-7 (Tr. at 231) (Page ID #4376). Later tests revealed sperm heads on the inside of the crotch area of her shorts. *Rogers II*, 188 S.W.3d at 600.

At the guilt/innocence phase of trial, the jury convicted Rogers on each of nine counts, including one count of first-degree premeditated murder, two counts of first-degree felony murder, two counts of aggravated kidnapping, two counts of rape of a child, and two counts of criminal impersonation. R. 25-11 (Tr. at 221–22) (Page ID #5132–33).

At the penalty phrase, several mitigation witnesses testified. The most significant mitigation witness was Rogers's sibling Sam,[1] who testified that their stepfather "often" "slapp[ed]," "hit[]" and "punch[ed]" them, starting from the time that Rogers was four or five years old. R. 25-13 (Tr. at 112–13, 138–39) (Page ID #5383–84, 5409–10). Sam explained that Rogers was often chained to the bed, for up to days on end. *Id.* at 119–22 (Page ID #5390–93). If Rogers soiled the bed or his pants, their stepfather would rub Rogers's face in the soiled pants or mattress. *Id.* at 124–25, 130 (Page ID #5395–96, 5401). Their stepfather would also lock himself and Rogers in the bathroom, and Sam believed that he was forcibly giving Rogers enemas. *Id.* at 133–36 (Page ID #5404–07). Additional family members and other lay witnesses also briefly testified that Rogers was abused. Three expert witnesses also testified. Cecille Guin, a social worker, testified in general terms about the violent and abusive conditions at the Louisiana Training Institute (LTI), an institution at which Rogers had been confined. *Id.* at 119–24 (Page ID #5777–82). Psychologist Tom Neilson testified that he had diagnosed Rogers with posttraumatic stress disorder, which resulted from the trauma he experienced, depressive disorder not otherwise specified, dissociative disorder not otherwise specified, and a personality disorder not otherwise specified with antisocial and borderline features. R. 25-14 (Tr. at 287–309) (Page ID #5559–81). Psychiatrist Keith Caruso testified that Rogers met "diagnostic criteria for anti-social personality disorder and for border line personality disorder." R. 25-16 (Tr. at 149–50) (Page ID #5813–14).

The jury sentenced Rogers to death. R. 25-17 (Tr. at 38) (Page ID #5983). It found four aggravating circumstances: (1) the defendant was previously convicted of one or more felonies that involve the use of violence; (2) the murder was committed with the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution; (3) the murder was committed against a person younger than twelve and the defendant was at least eighteen; and (4) the murder was knowingly committed while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing, or attempting to commit, rape or kidnapping. *Id.* at 36–37 (Page ID #5981–82); *see also* Tenn. Code Ann. § 39-13-204(i)

---

[1]The state's brief, state-court decisions, and district-court decision all refer to Sam as Mildred Rogers, which was Sam's prior name. Sam has since changed their name to Samuale Danielle Roger (no "s"). R. 25-13 (Tr. at 90) (Page ID #5361); R. 112-6 (Roger Decl. at 1) (Page ID #13577).

(1996).  The jury unanimously found that these aggravating factors outweighed any mitigating factors beyond a reasonable doubt.  R. 25-17 (Tr. at 37) (Page ID #5982).

The trial court denied Rogers's motion for a new trial.  R. 24-5 (Order) (Page ID #1168–90).  Rogers appealed, first to the Tennessee Court of Criminal Appeals and then to the Tennessee Supreme Court.  Both courts affirmed Rogers's convictions and sentence.  *State v. Rogers* ("*Rogers I*"), No. M2002-01798-CCA-R3-DD, 2004 WL 1462649, at *1 (Tenn. Ct. Crim. App. June 30, 2004); *Rogers II*, 188 S.W.3d at 598.

Rogers then filed a petition for post-conviction relief.  R. 26-7 (Second Am. Pet. for Post-Conviction Relief) (Page ID #7755–80).  The post-conviction court denied the petition.  R. 26-8 (Order) (Page ID #7863–8056).  The Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief.  *Rogers v. State* ("*Rogers III*"), M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *1 (Tenn. Crim. App. Aug. 30, 2012).   The Tennessee Supreme Court denied review.  R. 26-19 (Order) (Page ID #10186).

Rogers filed a habeas petition in federal district court.  R. 14 (Am. Pet. for Writ of Habeas Corpus) (Page ID #44–139).   The district court denied the petition.  *Rogers v. Westbrooks* ("*Rogers IV*"), No. 3:13-cv-00141, 2019 WL 1331035 (M.D. Tenn. Mar. 25, 2019).  Rogers timely appealed.  R. 156 (Notice of Appeal) (Page ID #27325–26).

## II.  ANALYSIS

### A.  Standard of Review

We review de novo a district court's decision to grant or deny a writ of habeas corpus.  *Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011).  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "Where the state court fails to adjudicate a claim on the

merits, however, AEDPA's deferential standard of review does not apply." *Williams v. Anderson*, 460 F.3d 789, 796 (6th Cir. 2006).

A state-court decision is contrary to clearly established federal law if "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state-court decision unreasonably applies clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08.

"[C]learly established Federal law . . . refers to the holdings, as opposed to the dicta of [Supreme Court] decisions as of the time of the relevant state-court decision." *Id.* at 412. "Although courts of appeals' decisions do not establish new rules, the court may look to such decisions to inform its analysis of whether a legal principle had been clearly established by the Supreme Court." *Avery v. Prelesnik*, 548 F.3d 434, 436–37 (6th Cir. 2008).

## B. Exhausted Claims

### 1. Sufficiency of the Evidence to Support Finding of Rape (Claims G.39, I.5, I.8–11)

First, Rogers argues that there is insufficient evidence that he raped Beard, which was a component of his conviction for felony murder. He further contends that the Tennessee Supreme Court's rejection of his sufficiency-of-the-evidence challenge was contrary to or an unreasonable application of clearly established federal law. We hold that this argument fails.

When determining whether there is sufficient evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is

purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 324 n.16).

Because AEDPA deference applies, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court" and "instead may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). "When reviewing whether the state court's determination was 'objectively unreasonable,' this court necessarily engages in a two-step analysis." *Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008). First, the court determines "whether the evidence itself was sufficient to convict under *Jackson.*" *Id.* If not, the court "must then apply AEDPA deference and ask whether the state court was 'objectively unreasonable' in concluding that a rational trier of fact could have found [the defendant] guilty beyond a reasonable doubt." *Id.* "Thus, two layers of deference apply, one to the jury verdict, and one to the state appellate court." *Tanner v. Yukins*, 867 F.3d 661, 672 (6th Cir. 2017).

To establish felony murder in perpetration of a rape, the state needed to prove that Rogers killed Beard "in the perpetration of or attempt to perpetrate . . . rape." Tenn. Code Ann. § 39-13-202(a)(2) (1996). To establish rape, the state needed to prove that there was "unlawful sexual penetration." *Id.* § 39-13-522(a). To establish "sexual penetration," the state needed to prove "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body." *Id.* § 39-13-501(7).

In rejecting Rogers's sufficiency-of-the-evidence claim, the Tennessee Supreme Court relied on only four factors to support the conviction for rape: (1) the sperm heads found on the inside crotch of Beard's shorts; (2) Beard's mother's testimony[2] that Beard changed into clean shorts right before she disappeared; (3) the investigator's testimony that Beard's shirt was found inside out; and (4) the inference that Rogers was the last person to see Beard alive. *Rogers II,*

---

[2]Meyer testified that Beard "got her[self] some clean [shorts] and went in the bathroom and changed" around 1:45 p.m., R. 25-4 (Tr. at 96–97) (Page ID #3621–22), and Beard was missing by the time Meyer went outside at 1:55 p.m., *id.* at 97–98 (Page ID #3622–23).

188 S.W.3d at 617.  The Tennessee Supreme Court concluded that it was reasonable to infer that the sperm heads came from Rogers and that they were evidence of penetration.

This is a close case regarding sufficiency.  The fact that Beard's shirt was inside out was of limited relevance because (1) it does not provide evidence of penetration; and (2) Beard's remains and clothing were scattered, which one of the state's experts explained was due to scavenging by animals.  R. 25-8 (Tr. at 88) (Page ID #4493).  Thus, the only evidence of penetration was the sperm on Beard's shorts, and the only evidence that Rogers was responsible for the sperm was the testimony that Beard had changed into clean shorts before she left the house, coupled with the evidence that Rogers abducted and killed her.  Jurors may "draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  If, however, the evidence leads to only "reasonable speculation" about those ultimate facts, the evidence is insufficient to support a conviction.  *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008).  We agree with the trial court's statement that the sufficiency of the evidence of penetration was "somewhat of a 'close call.'"  R. 24-5 (Order at 6) (Page ID #1173).  On direct review, we might have found such evidence to be insufficient.

Nevertheless, AEDPA deference applies.  "The question 'is not whether a federal court believes the state court's determination . . . was incorrect but whether that determination was unreasonable—a substantially higher threshold.'"  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).  In a case with a similarly small amount of direct evidence, we have nonetheless denied habeas relief, pointing to AEDPA's deferential standard.  *See Durr v. Mitchell*, 487 F.3d 423, 448 (6th Cir. 2007) (although the court might be "hard-pressed to conclude" on de novo review that there was sufficient evidence of rape in a case with "absolutely no physical evidence of any penetration," AEDPA's deferential standard led the court to affirm the denial of the habeas petition).  We therefore affirm the denial of Rogers's sufficiency claims.

## 2. Exclusion of Cross-Examination and Evidence Regarding Prior Sexual Acts Between the Victim and Her Brother (Claims G.21–24, G.26, G.44)

Next, Rogers argues that the trial court improperly excluded cross-examination and evidence regarding prior sexual acts between Beard and her brother, Jeremy Beard.[3]  Through questioning of both Jeremy, R. 25-4 (Tr. at 44–46, 49) (Page ID #3569–71, 74), and Meyer, *id.* at 209 (Page ID #3734), Rogers sought to admit evidence that Jeremy Beard had previously made statements that his biological father taught him to have sex with his sister.  The trial court did not allow this line of questioning on the grounds that it was "remote in time and irrelevant and possibly confusing to the jury and inadmissible."  *Id.* at 70 (Page ID #3595); *see id.* at 214–15 (Page ID #3739–40).  Rogers argues that the exclusion of this evidence is an unreasonable application of *Chambers v. Mississippi*, 410 U.S. 284 (1973).  We disagree.

In *Chambers*, the Supreme Court held that the trial court denied the defendant the right to a fair trial when it did not allow him to present certain exculpatory evidence.  Another witness, McDonald, had given a sworn confession that he had committed the crime.  Although Chambers was permitted to call McDonald and introduce the confession, Chambers was neither permitted to re-examine McDonald after McDonald recanted the confession nor allowed to call other witnesses to testify about McDonald's verbal confessions to them.  *Id.* at 291–94.  In concluding that "the exclusion of this critical evidence . . . denied him a trial in accord with traditional and fundamental standards of due process," *id.* at 302, the Court explained that the excluded evidence was "critical to Chambers' defense," "tended . . . to exculpate Chambers," and "bore persuasive assurances of trustworthiness," *id.* at 297, 302.

The Tennessee Supreme Court did not unreasonably apply *Chambers*.  First, Jeremy's past statements did not bear "persuasive assurances of trustworthiness."  *Id.* at 302.  Jeremy could not remember making the statements.  R. 25-4 (Tr. at 44–46) (Page ID #3569–71); *see Rogers II*, 188 S.W.3d at 613.  Jeremy struggled with significant psychological issues:  he lived in a residential facility at the time of trial, and he had previously lived in various residential treatment facilities, mental-behavioral hospitals, group homes, detention centers, and foster homes.  R. 25-4 (Tr. at 40–42) (Page ID #3565–67).  Although his mother told a therapist that

---

[3]For clarity, we refer to Jeremy Beard by his first name throughout this opinion.

Jeremy told her that his father taught him to have sex with his sister, Meyer testified that she passed along this information "[t]o see if he really had or, you know, if he was telling the truth." R. 25-4 (Tr. at 209) (Page ID #3734). No other evidence indicated that Jeremy had ever had sex with his sister, meaning that Jeremy's statements were entirely uncorroborated. *Rogers II*, 188 S.W.3d at 613.

Additionally, these statements were "not nearly as relevant to [the] defense as the confessions in *Chambers*." *Washington v. Renico*, 455 F.3d 722, 735 (6th Cir. 2006). First, as the trial court explained, these statements—and any potential underlying sexual activity—were "remote in time." R. 25-4 (Tr. at 70) (Page ID #3595). Jeremy had not lived with or seen his father since 1991, five years before his sister's disappearance, R. 25-4 (Tr. at 211–12) (Page ID #3736–37). No evidence suggested that Jeremy had sex with his sister after that time. More significantly, unlike *House v. Bell*, 547 U.S. 518, 548 (2006), in which key physical evidence could be directly linked to a different suspect, nothing connected Jeremy to the semen on Jackie Beard's shorts, especially in light of the testimony that Jackie Beard put on new shorts immediately before leaving the house.**[4]** *See Rogers II*, 188 S.W.3d at 613. Accordingly, the Tennessee Supreme Court decision was not contrary to or an unreasonable application of *Chambers*.

### 3. Ineffective Assistance of Trial Counsel by Not Adequately Challenging Semen Evidence (Claim C.12)

Rogers argues that trial counsel rendered ineffective assistance by failing to investigate the serological evidence and conduct an adequate cross-examination regarding this evidence. To demonstrate ineffective assistance of counsel, Rogers must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show deficient performance, Rogers must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* To show prejudice, Rogers must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

---

**[4]**It is undisputed that Jeremy had no involvement in the crime.

*Id.* "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

"The combined effect of *Strickland* and § 2254(d) is 'doubly deferential' review." *Foust*, 655 F.3d at 533 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable" but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

For the reasons that follow, we hold that the Tennessee Court of Criminal Appeals unreasonably applied *Strickland* when it rejected Rogers's ineffective-assistance claim regarding counsel's failure adequately to challenge the semen evidence. Although this deficiency was not prejudicial at the guilt/innocence phase of trial, it was prejudicial at the penalty phase.

### a. Performance Prong

Every court to consider this claim has found that Rogers's counsel performed deficiently. *See Rogers IV*, 2019 WL 1331035, at *30; *Rogers III*, 2012 WL 3776675, at *47; R. 26-8 (Order at 59–60) (Page ID #7921–22). This issue is also undisputed before this court. *See* Appellee Br. at 39 n.3. The prosecution's experts performed various scientific analyses to test for semen, and defense counsel failed adequately to challenge this evidence.

In finding that counsel's performance was deficient, the state post-conviction court explained:

> The testimony of Ms. Clement and Mr. Squibb at the [post-conviction] hearing reveals certain deficiencies in Mr. Warner's cross-examination of those witnesses at trial. Mr. Squibb's testing produced evidence favorable to the petitioner, but counsel did not present some of this evidence to the jury. For instance, the jury did not hear there were very few (or "rare," the term used by the TBI lab to denote fewer than ten) sperm heads found on the microscopic slides developed from the victim's shorts. Mr. Squibb was also not asked about his testing for semen in great detail; the jury heard no information about the mechanics of the acid phosphatase test (color changes, timing, etc.) or that Mr. Squibb's acid phosphatase test yielded a "weak" positive result. The jury heard nothing about the P30 antigen as it related to seminal fluid or that Mr. Squibb's testing yielded negative results for P30. The jury also did not hear that very little DNA was derived from the stains taken from the victim's shorts. Perhaps most

relevant, counsel for the petitioner did not present evidence attacking Mr. Squibb's conclusion that the presence of sperm cells necessarily indicated the presence of semen. Given Ms. Clement's testimony and the publication of the washing machine study[5] in the Canadian forensic journal—an article published some four years before the trial in the instant case—such evidence was available to counsel.

R. 26-8 (Order at 59–60) (Page ID #7921–22). The Tennessee Court of Criminal Appeals "agree[d] with the post-conviction court's analysis." *Rogers III*, 2012 WL 3776675, at *47. We also "give due deference to the conclusions of the trial judge on the effectiveness of counsel, because '[t]he judge, having observed the earlier trial, should have an advantageous perspective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial.'" *Foster v. Wolfenbarger*, 687 F.3d 702, 708 (6th Cir. 2012) (quoting *Massaro v. United States*, 538 U.S. 500, 506 (2003)).

For the reasons articulated by the post-conviction court, counsel's performance was deficient. The Supreme Court has "long . . . recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable." *Padilla*, 559 U.S. at 366 (quoting *Strickland*, 466 U.S. at 688). The ABA standards that prevailed long before the trial speak clearly to the need for counsel to investigate and challenge the prosecution's evidence, including the evidence offered by expert witnesses. The standards clarify that "[c]ounsel should conduct independent investigations." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) (hereinafter "ABA Std."), 11.4.1(A). Counsel "must be able to zealously challenge the prosecution's evidence and experts through effective cross-examination." 1989 ABA Std. 1.1 (Commentary). "[C]ounsel should secure the assistance of experts where it is necessary or appropriate for . . . adequate understanding of the prosecution's case." 1989 ABA Std. 11.4.1(D)(7).

---

[5]The "washing machine study" refers to Clement's post-conviction testimony about a 1996 article published in the Canadian Journal of Forensic Sciences that suggested spermatozoa could transfer in the washing machine from soiled to unsoiled underwear. R. 26-10 (Tr. at 250–52) (Page ID #832527).

Rogers's counsel's performance was not up to these standards. Although, as discussed above, the sperm evidence was the *only* evidence of penetration, Rogers's counsel "wasn't as concerned about" the semen evidence, R. 26-9 (Tr. at 83–84) (Page ID #8154–55), and did not ask Squibb "about his testing for semen in great detail." *Rogers III*, 2012 WL 3776675, at *46 (agreeing with post-conviction court). Counsel also failed to "present some of this [favorable] evidence to the jury," including evidence that called into doubt whether the presence of sperm indicated the presence of semen. *Id.*; R. 26-9 (Tr. at 83) (Page ID #8154). Further, although a P30 test is used to indicate the presence of semen and although Squibb's P30 test was negative, meaning that it did not indicate the presence of semen, Rogers's counsel, at trial, established "nothing about the P30 antigen as it related to seminal fluid or that Mr. Squibb's testing yielded negative results for P30." R. 26-8 (Order at 59) (Page ID #7921). In fact, Rogers's counsel later admitted that he did not even know what P30 is. R. 26-9 (Tr. at 89) (Page ID #8160). Because of these inadequacies, counsel's performance was deficient.

### b. Prejudice Prong

Rogers argues that the state court unreasonably applied *Strickland* by determining that there was no prejudice. To show prejudice, Rogers must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This probability must be "sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693). Because AEDPA deference also applies, Rogers must show that "[i]t would . . . have been unreasonable" for the state court to determine that "evidence of prejudice fell short of this standard." *Id.* at 112.

### (1) Guilt/Innocence Phase

The Tennessee Court of Criminal Appeals offered the following explanation to support its conclusion that there was no prejudice:

> [T]he fact remains that Squibb found sperm heads on the fabric samples taken from the crotch area of the victim's shorts. Clement agreed at the post-conviction hearing with Squibb's finding of sperm heads. The victim's mother testified at

trial that the victim had put the shorts on right before leaving her house and disappearing. While Clement's testimony at the post-conviction hearing established that it is possible for sperm heads to arrive on clothing while being laundered in a washing machine, she also testified that the experiments in which such transfer occurred involved washing new clothing with "a pair of underwear worn by someone who had consensual relations." Thus, proof of these experiments would not have been relevant at trial unless the defense had also been able to establish at least some probability that the victim's shorts had been washed with an item containing semen. No such probability was established at the post-conviction hearing. Therefore, we cannot conclude that Trial Counsel's performance in his cross-examination of Squibb prejudiced the Petitioner.

> In sum, Trial Counsel should have attacked the State's proof regarding the semen/sperm issue with more vigor. The Petitioner, however, has not established that the jury's verdicts are unreliable as a result of this failure because there has been no showing that the defense would have been able to eliminate or completely discredit the State's proof that sperm heads were found in the crotch area of the victim's shorts. That proof, together with the substantial proof at trial that the Petitioner was the last person to see the victim alive, leaves us confident in the jury's verdict. Accordingly, the Petitioner is not entitled to relief on this basis.

*Rogers III*, 2012 WL 3776675, at *47. This analysis unreasonably applies *Strickland*.

In determining prejudice, a court looks at "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696; *see Foster*, 687 F.3d at 710. As discussed above, penetration was a necessary element of the crime, and the *only* evidence of penetration was the sperm heads on the shorts.

Counsel's undisputed deficiencies directly relate to this evidence. As the Tennessee courts acknowledged, if counsel had not been deficient, the jury would have been able to hear that there were very few (fewer than ten) sperm heads on the slides developed from the shorts, that the acid phosphatase test yielded only a weak positive result, that the P30 antigen test was negative, that very little DNA could be taken from the sperm, that sperm does not necessarily indicate the presence of semen, and that sperm can be transferred between different items of clothing in the washing machine. *Rogers III*, 2012 WL 3776675, at *46. Together this evidence calls into question whether there was semen on the shorts—which, again, was the only evidence

of penetration presented by the prosecution. The Tennessee Court of Criminal Appeals thus unreasonably applied *Strickland* when it found that this deficiency did not prejudice the defendant.

The Tennessee Court of Criminal Appeals' unreasonable application of *Strickland* was rooted in its reasoning that there was no prejudice because the defense could not have "eliminate[d] or completely discredit[ed] the State's proof that sperm heads were found in the crotch area of the victim's shorts." *Id.* at *47. Rogers did not need to "eliminate or completely discredit" this evidence to undermine confidence in the jury verdict. This is not a case in which there was substantial other evidence pointing to rape. *Compare Higgins v. Renico*, 470 F.3d 624, 634 (6th Cir. 2006) (failure to cross-examine key witness was prejudicial because without this testimony, the state's case was "far from overwhelming"), *with Poindexter v. Mitchell*, 454 F.3d 564, 572 (6th Cir. 2006) (failing to cross-examine witness about inconsistencies in testimony was not prejudicial because multiple eyewitnesses saw the defendant commit the crime). Because penetration—a necessary element of the rape conviction—was "only weakly supported by the record," it was "more likely to have been affected by errors than [a conclusion] with overwhelming record support." *Strickland*, 466 U.S. at 696. In short, where (1) the trial court acknowledged that whether there was sufficient evidence to support a rape conviction was a "close call," R. 24-5 (Order at 6) (Page #1173); (2) counsel's performance was undisputedly deficient by failing to undermine the *only* evidence of penetration; and (3) penetration is a necessary element of the rape conviction, it follows that (4) the state court unreasonably applied *Strickland* when it determined that counsel's deficient performance did not render the rape conviction unreliable.

Nevertheless, we cannot say that there was prejudice at the guilt/innocence phase of trial. The jury convicted Rogers of both felony murder and premeditated murder, R. 25-11 (Tr. at 221–22) (Page ID #5132–33), and the judge merged the two felony murder counts—one for felony murder in perpetration of kidnapping and one for felony murder in perpetration of rape—into the count for premeditated murder, R. 24-5 (J.) (Page ID #1142). Rogers now argues that the error regarding the rape conviction goes to both his conviction for felony murder in perpetration of rape and his conviction for premeditated murder. We agree that the errors undermine our

confidence in the conviction for felony murder in perpetration of rape. It is not necessary for us to decide whether these errors prejudicially impacted the premeditated murder conviction because the jury also convicted Rogers of first-degree felony murder in perpetration of a kidnapping. R. 25-11 (Tr. at 222–23) (Page ID #5132–33). Because all three murder convictions were merged, this error could not undermine Rogers's conviction for murder.

### (2) Penalty Phase

Although Rogers's ineffective-assistance claim does not undermine our confidence that, absent these errors, the jury would have convicted Rogers of murder, these errors were prejudicial at the penalty phase. Because the state court did not address this question, *see Rogers III*, 2012 WL 3776675, at *47, we review de novo the impact of the rape conviction on the jury's weighing of the aggravating and mitigating factors. *See Williams v. Anderson*, 460 F.3d at 796. The rape of a nine-year-old child is so grievous that we conclude that, in the absence of a rape conviction, there is a reasonable probability that at least one juror would have weighed the aggravating and mitigating factors differently.

In Tennessee, two relevant statutory requirements govern the imposition of the death penalty. First, "[n]o death penalty . . . shall be imposed but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances." Tenn. Code Ann. § 39-13-204(i) (1996).[6] Second, the Tennessee Code authorizes the death penalty only if the aggravating factors "have been proven by the state beyond a reasonable doubt" and "have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt." *Id.* § 39-13-204(g)(1)(A)–(B). If, after deliberations, "the jury still cannot agree as to sentence, the trial judge shall dismiss the jury and the judge shall impose a sentence of imprisonment for life." *Id.* § 39-13-204(h)(1). In short, if there is a reasonable probability that the rape-related aspect of the crime impacted the way that at least one juror weighed the aggravating and mitigating factors, the error was prejudicial. The state's brief addressed only § 39-12-204(i) and did not address—at all—the question raised by § 39-13-204(g)(1) of whether the rape conviction would cause the jury to weigh the aggravating

---

[6]Our analysis does not rest on § 39-12-204(i). At least two aggravating factors would exist even in the absence of the rape conviction, so, the requirements of § 39-13-204(i) are met regardless of trial counsel's error.

and mitigating factors differently.  *See* Appellee Br. at 28–29 (discussing, in the context of the sufficiency argument, the statutory aggravating factors).

Our analysis turns on the statutory requirement about which the state was silent:  the requirement in § 39-13-204(g)(1)(B) that the aggravating factors outweigh the mitigating circumstances "beyond a reasonable doubt."  The rape of a child is a particularly significant aggravating factor—much more so than many of the other aggravators.  As a society, we view child rape as particularly heinous—perhaps even the most heinous thing that a person can do.  This matters at the penalty phase, when jurors must weigh the aggravating factors against the mitigating ones.  An aggravating factor that is accorded significant weight will thus have a significant impact on this weighing calculus.

The Supreme Court has made clear that a child-rape conviction completely distorts the weighing of aggravating and mitigating factors in a way that cannot readily be rectified.  *See Kennedy v. Louisiana*, 554 U.S. 407, 439 (2008).  Child rape is "a crime that in many cases will overwhelm a decent person's judgment" in a way that makes it difficult for a jury to balance the other aggravating and mitigating factors.  *Id.*  The dissent correctly points out that the criminal conduct in this case was "highly inflammatory and disturbing" even without the rape conviction.  Dissenting Op. at 46.  We do not disagree.  But the combination of rape and murder of a nine-year-old child is *so* disturbing that it is significantly likely that the child rape conviction would have "overwhelm[ed]" at least one juror's judgment in a way that affected their weighing of the aggravating and mitigating circumstances.  *Kennedy*, 554 U.S. at 440.  Although there were multiple aggravating factors in this case, the rape of a child is by far the most significant one.  Both crimes are heinous.  But raping and murdering a child is far worse than murder alone:  the added element of child rape makes the crime altogether more sadistic.

The uniquely aggravating nature of child rape is heightened by the fact that *at the time of Rogers's trial*, the Supreme Court had not yet prohibited the imposition of the death penalty for cases of child rape that did not result in the death of the victim.  *See Kennedy*, 554 U.S. 407.

Indeed, the rape of a child was the last non-homicide crime against a person for which the death penalty was authorized. *See id.*[7]

Because we look at whether there is a reasonable probability that one juror would have changed their mind, we note that at least some Tennesseans believed that child rape alone should be grounds for the death penalty, even in the absence of a homicide offense. True, Tennessee did not, at that time, have a death penalty for child rape. Tennessee previously had such a law, but it was invalidated by the Tennessee Supreme Court because it imposed a *mandatory* death penalty for child rape. *See Collins v. State*, 550 S.W2d 643, 646 (Tenn. 1977) (invalidating Tennessee's mandatory death penalty); Tenn. Code Ann. §§ 39-3702, 39-3705 (1974) (imposing mandatory death penalty for cases of child rape). Within a few years of the trial, Tennessee legislators proposed a capital child-rape bill and withdrew it only because of budgetary concerns. *Kennedy*, 554 U.S. at 459. Because, in this case, the child rape conviction need only have impacted the way that one juror weighed the aggravating and mitigating factors, we do not need to speculate about the potential trajectory of the bill to understand its significance. Instead, the efforts—spanning decades—of democratically elected Tennessee legislators to impose the death penalty for perpetrators of child rape confirm that at least some Tennesseans believed that child rape provided independent grounds to impose the death penalty. Such views reinforce our conclusion that there is a reasonable probability that at least one juror would have weighed the aggravating and mitigating factors differently absent the child rape conviction.

The prosecution's strategy at the penalty phase confirms our conclusion. In closing argument, the prosecution repeatedly centered on the rape conviction. The prosecution emphasized that Rogers killed Beard:

> because he intended to rape this child, which he did. Because he raped the child, he had to remove her from this county, and take her some place where he would hope that she would never, ever be found . . . . And the reason for that, ladies and gentlemen, because of this aggravator, which is so powerful in and of itself that will convince you—convict this man and sentence him to death, because he did not want to see her come through that door back here, walk up that aisle right here, wearing her Minnie Mouse shirt and those teal shorts and those little sandals

---

[7]Child rape was a permissible capital offense for *more than thirty years* after the Supreme Court held the death penalty could not be imposed in cases of rape of adults. *See Coker v. Georgia*, 433 U.S. 584 (1977).

that she had on, walk up here, take the oath and get in that chair and point the
finger of guilt to this man.  That's why, that's why he killed her.  And ladies and
gentlemen, that is enough in of itself to sentence him to death.

R. 25-17 (Tr. at 7–8) (Page ID #5952–53).  The prosecutor's repeated emphasis on the rape of a
child and Rogers's efforts to conceal that rape, and the prosecutor's statements that this alone
warrants the death sentence, show that, in this case, the rape conviction was prejudicial.

When reweighing the aggravating and mitigating factors, we must also consider the
weight of the mitigating factors.  At the penalty phase of trial, several witnesses, including
Rogers's sibling Sam, told the jury about the horrific physical abuse that Rogers experienced as a
child:  to provide just a few examples, his stepfather frequently and violently beat him, regularly
chained him to the bed, and rubbed Rogers's face in his own excrement as punishment.  *See*
Section I, *supra*.  Two experts testified that Rogers's psychological disorders stemmed from the
abuse and trauma he endured.  *See id.*  There are weighty factors on both the aggravating and the
mitigating sides of the scale.

To the extent that the dissent implies that the facts may have led the jury to suspect rape,
even if they lacked "conclusive evidence of rape," this implication does not affect our analysis.
*See* Dissenting Op. at 46.  The Tennessee Statute directs jurors to weigh only *statutory*
aggravating circumstances against all mitigating factors.  *See* Tenn. Code Ann. § 34-12-204(g).
And these aggravating circumstances must be proven "beyond a reasonable doubt."  *Id.*  The
dissent highlights other concerning facts, but those facts do not impact the weighing calculation
because (1) they are not statutory factors, *see id.* § 39-12-204(i); and (2) absent counsel's
undisputedly deficient performance, they would not have been proven beyond a reasonable
doubt, *see id.* § 39-12-204(g)(1).

As explained above, even under AEDPA's deferential standard, we cannot be confident
that, in the absence of counsel's errors, Rogers would have been convicted of rape.  We thus
consider de novo the impact of removing this rape conviction.  Eliminating the statutory
aggravator for rape would have removed the most powerful aggravating factor and would have
likely caused the jury to weigh the aggravating and mitigating factors differently.  Murdering a
child is an unspeakably tragic crime.  But raping and then murdering a child is altogether more

heinous. Thus, on de novo review, we conclude that there is a reasonable probability that, to at least one juror, this difference mattered.

We therefore reverse the district court's decision with respect to this claim and remand to the district court with instructions to grant Rogers's habeas petition on this claim with respect to the penalty phase.

## C. Procedurally Defaulted Claims

Rogers also argues that the *Martinez-Trevino* exception to procedural default applies to an additional four groups of ineffective-assistance-of-counsel claims. Federal habeas courts are barred from considering federal constitutional claims that were defaulted in state court unless the prisoner can demonstrate cause for the default and actual prejudice that resulted or a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Although ineffective assistance of counsel on direct appeal may constitute cause to excuse the default, ineffective assistance of post-conviction counsel typically "cannot constitute cause to excuse the default in federal habeas." *Id.* at 757.

In *Martinez v. Ryan*, 566 U.S. 1, 9 (2012), the Court established a "narrow exception" to this rule: "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." In *Trevino v. Thaler*, the Court clarified that procedural default could be excused if:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 14–15, 17–18). *Trevino* extended *Martinez* to states in which the "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Id.* at 429. The *Martinez-Trevino* rule applies in Tennessee, and accordingly prongs three and four of the

test are met. *Sutton v. Carpenter*, 745 F.3d 787, 795–96 (6th Cir. 2014). As a result, the exception applies to Rogers's claims if the underlying ineffective-assistance-of-trial-counsel claim is substantial and if ineffective counsel during the initial collateral-review proceeding prevented Rogers from raising the claim. To be substantial, a claim must have "some merit." *Martinez*, 566 U.S. at 14.

In this case, habeas counsel performed a thorough investigation, uncovering extensive and compelling evidence that trial counsel failed to pursue. This evidence was presented to the district court. Typically, we would decide the case based on the evidence that was before the district court. However, after the parties in this case had completed briefing and oral argument, the United States Supreme Court decided *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022). This decision held that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." *Id.* at 1734. As a result of this timeline, we do not have the benefit of the parties' briefing about how *Shinn v. Ramirez* should affect the disposition of this case. Although we might typically remand for consideration in light of the Supreme Court's decision in *Shinn v. Ramirez*, our grant of habeas corpus at the penalty phase on Claim C.12 (ineffective assistance for failing adequately to challenge the semen evidence) entitles Rogers to resentencing in state court. Resentencing vitiates the need for the district court to consider these issues, and therefore we simply vacate the district court's opinion as to these claims.

## 1. Failure to Investigate Jeremy Beard as a Source of Semen (Claims C.8, D.26)

Rogers argues that the *Martinez-Trevino* exception applies to his claim that trial counsel was ineffective by failing to investigate Jeremy Beard as a source of the sperm found on Jackie Beard's shorts. Rogers did not raise these claims in any state court proceeding and presented them for the first time before the federal district court on habeas review.[8]

---

[8]These claims are similar to Claim C.12 (that trial counsel failed to investigate the semen evidence), which Rogers exhausted in state court and we address in section II.B.3. The district court acknowledged the potential overlap between these two claims. *See Rogers IV*, 2019 WL 1331035, at *106 (analyzing these claims "[t]o the extent that these are indeed new claims (as opposed to new evidence in support of an exhausted claim that counsel was ineffective in failing to prove that Jeremy was the source of the semen)"). On appeal, neither party argues that these claims are merely an extension of Claim C.12. Despite the similarities between these claims, they are properly

Although we cannot say what evidence may ultimately be considered, we disagree with the district court that, based on the record before it, Rogers's ineffective-assistance claim was insubstantial. The district court found that no new evidence conflicted with the evidence that Beard left the house in clean shorts, and the district court doubted that trial counsel could have obtained this evidence if they had tried. *Rogers IV*, 2019 WL 1331035, at *106-07. The evidence before the district court was inconsistent with these findings. For example, new evidence suggested that Jackie did not leave the house in clean shorts: this included significant evidence that there were regularly piles of dirty laundry throughout the house, R. 129 (Jeremy Beard Dep. at 26) (Page ID #26240); R. 125-13 (Edgin Decl. ¶ 7) (Page ID #24377), and that the children frequently wore dirty and unwashed clothes that smelled of animal urine, R. 125-9 (Evans Decl. ¶¶ 3–5) (Page ID #24365); R. 125-10 (Medlock Decl. ¶ 5) (Page ID #24367); 125-11 (Donaldson Smith Decl. ¶ 2) (Page ID #24369); R. 125-12 (Thompson Decl. ¶¶ 6–7) (Page ID #24372–73); R. 125-13 (Edgin Decl. ¶¶ 5, 7) (Page ID #24376–77); R. 129 (Jeremy Beard Dep. at 68–69) (Page ID #26282–83), as well as Jeremy Beard's statement that he used a pair of Jackie Beard's shorts to wipe himself off after he masturbated "within a couple of days of her disappearance," R. 81-2 (Jeremy Beard Decl. at 2) (Page ID #12103).[9] This evidence could not have been dismissed as unattainable because (1) there were multiple paths to eliciting this evidence, including by talking to teachers, caregivers, and friends; and (2) witnesses' potential reluctance to share information cannot excuse failing to investigate that witness in the first place. *See* 1989 ABA Std. 11.4.1 (commentary) ("Nor may counsel 'sit idly by, thinking that investigation would be futile.'").

A proper inquiry into whether these claims are substantial instead would have asked whether there is "some merit" to the claim that counsel's deficient investigation prejudiced Rogers. *Martinez*, 566 U.S. at 14. The record before the district court showed that the claim had at least some merit.

---

viewed separately because the issues exhausted in state court (encompassed in Claim C.12) related only to the scientific investigation and cross-examination. In contrast, Claims C.8 and D.26 address the investigation into the specific facts involving Jeremy Beard's actions and home conditions that could have shown that Jeremy was a source of the semen.

[9] Jeremy had a history of using others' underwear while masturbating. R. 125-6 (Westerbeck-Deckle Decl. ¶ 13) (Page ID #24342).

First, Rogers presented to the district court a substantial claim that counsel's performance was deficient. Because the performance prong "is necessarily linked to the practice and expectations of the legal community[,] '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Padilla*, 559 U.S. at 366 (quoting *Strickland*, 466 U.S. at 688). In this case, the prevailing professional norms required a more thorough investigation. "[C]ounsel has a duty to make reasonable investigations," and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. The operative ABA standards at the time provided that "[c]ounsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial." 1989 ABA Std. 11.4.1(A); *see* 1989 ABA Std. 1.1 (Commentary) ("Substantial pretrial investigation is a necessary base for intelligent assessment of possibly conflicting options as to the defense.").

As discussed above, the *only* pieces of evidence presented at trial supported the claim that Rogers raped Beard: the sperm on Beard's shorts and Meyer's testimony that Beard changed into clean shorts shortly before she was abducted. Despite counsel's theory that Jeremy Beard may have been the source of the sperm, counsel did not talk to Jeremy before the trial at all, nor did they ask any other potential witness, such as Jeannie Meyer, whether Jeremy could have been the source of the semen. Nor did they interview any possible witnesses to determine whether Jackie Beard's shorts were clean. Nor did they ask Jeremy Beard at trial whether he might have been the source of the semen. These failures "resulted from [counsel's] ignorance of this evidence, not from an informed choice" about trial strategy. *Sowell v. Anderson*, 663 F.3d 783, 790 (6th Cir. 2011).

Rogers also presented the district court with a substantial claim that counsel's deficient performance prejudiced him. As discussed above, a deficiency that failed to uncover evidence that called into question the sperm on the shorts prejudiced Rogers at the penalty phase of trial, but not at the guilt/innocence phase of trial. As a result, Rogers's ineffective-assistance claim regarding counsel's failure to investigate Jeremy Beard as a source of the semen is substantial. Thus, we vacate this portion of the district court's opinion.

Although we find this evidence compelling, we do not yet know how much of it may ultimately be considered in light of *Shinn*, and we do not make any conclusions of our own with regard to these ineffective-assistance claims. Because Rogers is entitled to resentencing based on Claim C.12, however, there is no need for the district court, on remand, to decide what evidence it can consider.

## 2. Mitigation Claims (Claims C.20–23, E.2–5)

We next turn to Rogers's claims that counsel was ineffective in their investigation, development, and presentation of mitigating evidence. We hold that these claims were defaulted at the initial post-conviction proceeding and not on appeal. Therefore, the *Martinez-Trevino* exception may excuse Rogers's procedural default of these claims.

### a. Procedural Default

Rogers argues that *Martinez-Trevino* excuses the procedural default of his ineffective-assistance claims with respect to counsel's failure to investigate, develop, and present mitigating evidence. It is undisputed that these claims were procedurally defaulted in state court post-conviction proceedings. What is disputed, however, is the stage at which these claims were defaulted. The state argues that the mitigation claims were presented and considered at the trial-court level in the post-conviction stage but were defaulted on appeal. Appellee Br. at 50. Rogers argues that these cases were procedurally defaulted at the initial post-conviction proceeding because his mitigation claims were so barebones that they were never fairly presented to the state post-conviction trial court.

Although the *Martinez-Trevino* exception can excuse procedural default at the *initial* post-conviction stage, it "does not apply to save procedural defaults that occur in 'appeals from initial-review collateral proceedings.'" *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1136 (6th Cir. 2016) (quoting *Martinez*, 566 U.S. at 16). This court reviews de novo whether a habeas claim is barred by procedural default. *Id.* at 1134.

"To avoid procedural default, the petitioner must exhaust all state-court remedies," which requires "fair presentation of the federal claim to the state courts." *Williams v. Mitchell*, 792 F.3d 606, 613 (6th Cir. 2015) (internal citations and quotation marks omitted). "To fairly present a federal claim, a state prisoner is required to present the state courts with 'both the *legal* and factual basis' for the claim." *Id.* (quoting *Williams v. Anderson*, 460 F.3d at 806). However, "post-conviction counsel's failure to take all possible steps to fully develop a claim cannot be the 'cause' of a default as long as counsel properly raised the claim and made a good-faith effort in presenting it." *Hugueley v. Mays*, 964 F.3d 489, 499 (6th Cir. 2020).

In Rogers's state post-conviction petition, he stated only that "[c]ounsel failed to adequately investigate defense expert mitigation evidence" and "[c]ounsel failed to present available mitigation testimony and evidence during the sentencing phase of the trial." R. 26-7 (Second Am. Pet. ¶¶ 4.11, 5.24) (Page ID #7762, 7767). The petition did not offer factual allegations to support either claim. *Id.* Additionally, as the state post-conviction court noted, "no proposed mitigation evidence was presented during the evidentiary hearing." R. 26-8 (Order at 160–61) (Page ID #8022–23). As a result, the post-conviction court found that it could "only speculate as to the nature of any proposed mitigation evidence or the manner in which it would have aided the petitioner." *Id.* at 160 (Page ID #8022). Because post-conviction counsel entirely failed to develop this claim, there was no claim for the post-conviction court to analyze.

We have repeatedly held that a claim is procedurally defaulted when counsel entirely failed to develop a claim in a way that would allow a court to adjudicate an issue. In *Mitchell v. Genovese*, we held that a petitioner had procedurally defaulted his claim when the court's holding "was specifically predicated on a lack of evidence regarding the facts that pertain to [the] claim." 974 F.3d 638, 648 (6th Cir. 2020) (internal citations omitted). In *Williams v. Mitchell*, we held that a habeas petitioner failed to exhaust his claim before the Ohio Supreme Court when he made a "general reference to his trial counsel's failure to 'pursue' his intellectual limitations at trial" but did not "set[] forth the factual and legal underpinnings for the claim." 792 F.3d at 614. As a result, the state court was "unable to assess the facts and the law bearing on his constitutional claim." *Id.* at 615. In *Williams*, we applied this analysis to hold that the claims were defaulted on appeal. Rogers's claims were defaulted for the same reason but at the initial

post-conviction proceeding. The *Martinez-Trevino* exception is thus applicable to these claims. A contrary holding would "deprive [Rogers] of any review of that claim at all." *Trevino*, 569 U.S. at 423.**10** We thus vacate the district court's opinion as to these claims.

### b. Substantiality of Mitigation Claims

Because Rogers's mitigation claims were not fairly presented—and thus were defaulted—at the initial post-conviction proceeding, the *Martinez-Trevino* exception to procedural default applies if the claim is "substantial" and post-conviction counsel's ineffectiveness caused the procedural default. *Martinez*, 566 U.S. at 14. For a claim such as this, which asserts that counsel was ineffective with regard to the investigation into and development of mitigation evidence, we would typically decide whether counsel's performance was deficient and whether the available mitigation evidence shows that Rogers was prejudiced as a result. However, we do not have the benefit of the parties' briefing on the impact of *Shinn v. Ramirez* and what evidence we may consider. And, in light of our grant of habeas corpus at the penalty phase on Claim C.12, Rogers is entitled to resentencing regardless of the outcome on these mitigation claims. Thus, at this stage, we do not offer any conclusions regarding the substantiality of Rogers's mitigation claims.

We note, however, that the evidence before the district court starkly illustrates counsel's derelict investigation into and presentation of what should have been a highly compelling and disturbing account. Although we do not determine the extent to which a federal habeas court can consider any of this evidence, we cannot envision a just or humane system that, in the face of such overwhelming evidence, would provide no relief.

---

**10**This case is distinguishable from *West v. Carpenter*, 790 F.3d 693 (6th Cir. 2015), in which the petitioner's presentation of the claim was poor but the post-conviction court still had enough information to analyze the claim. In *West*, the petitioner did not "expressly" raise a conflict-of-interest claim but provided the grounds upon which that claim rested: that his lawyers would not present evidence of his parents' abuse because his parents were the ones paying the attorney. *Id.* at 695–96. In that case, the post-conviction court was able to evaluate the merits of the claim. *Id.* at 699. By contrast, the judge in this case could only "speculate" about the nature of the claim. R. 26-8 (Order at 160) (Page ID #8022).

**(1) Performance Prong**

If we were to consider the evidence that was presented to the district court, we would have no reservations in declaring counsel's performance to be deficient. "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688). "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.

Although we will defer to counsel's strategic decisions, the record before the district court showed that the decision not to investigate was not strategic. "'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 690–91). In this case, "counsel never offered, and no evidence supports, any tactical rationale for the pervasive oversights and lapses here." *Andrus v. Texas*, 140 S. Ct. 1875, 1883 (2020). Counsel's deficient performance could not be dismissed as strategy gone awry.

A checklist made by counsel near the trial date highlights their failure to obtain necessary tests and consults. *See* R. 124-9 (Notes) (Page ID #24211–14). The first eight items on the list are checked off: with respect to those items, counsel did what they needed to do. *Id.* at 1 (Page ID #24211). No checkmarks, however, appear next to the ninth and tenth items: "Obtain Neurologist" and "Obtain Neuropsych." *Id.* at 2 (Page ID #24212). Underneath these headers, counsel noted that they "need[ed] standard neuro exam; MRI; PET scan." *Id.* Yet, counsel never did these things despite an attempted "last minute scramble" to do so. R. 123-1 (Gleason Decl. at 5) (Page ID #23923). Extensive other evidence confirms that trial counsel knew Rogers needed a full neurological evaluation but failed to obtain one. *See, e.g.*, R. 124-4 (Resource Counsel Notes) (Page ID #24199) ("[G]iven the [history] of injuries, [an] MRI could be helpful."); R. 124-5 (Mem. at 2) (Page ID #24203) (investigator again suggested that counsel seek a neurological evaluation). Subsequent notes from counsel show that they looked into getting a neurological examination. R. 124-6 (Notes) (Page ID #24205) (counsel thought about

obtaining a neurological evaluation); R 124-7 (Notes) (Page ID #24207) (same).  This failure to obtain neurological examinations was particularly deficient considering that at least one of Rogers's attorneys believed that Rogers's history made the need to consult with a neuropsychologist and to obtain brain imaging "obvious."  *Id.* at 4 (Page ID #23922).

Counsel was correct that the need for brain imaging was obvious.  Among other records, trial counsel uncovered a 1982 psychological report from the Baton Rouge Health Center that recommended "a neurological work-up" because Rogers's "history of head traumas . . . may be associated with organic impairment."  R. 115-25 (Letter) (Page ID #14302).  He never received any such workup.  The defense also uncovered medical records showing that Rogers suffered repeated head injuries in his adulthood.  In June of 1980, he was hospitalized after being beaten until he was unconscious.  R. 113-10 (Clinical Records) (Page ID #13763, 13772).  In February of 1982, he was in an automobile accident, went through a windshield, was hospitalized for thirteen days after he suffered injuries—including head injuries—and "lost a year of memory." R. 115-23 (Discharge Summary) (Page ID #14239); R. 115-24 (Mental Illness Application) (Page ID #14300).  He was hospitalized again and sent to the hospital's trauma bay in 1988 after he was struck by a truck and a car while walking and sustained significant injuries, including a scalp laceration.  R. 117-8 (Medical Records) (Page ID #14663–65).

Counsel also learned of head injuries that Rogers suffered as a child.  They learned that, as a child, Rogers fell from an upper bunk onto a concrete floor, which significantly changed his personality.  R. 123-19 (Einstein Mem. at 2) (Page ID #24160).  Further, at least eight individuals told the investigator that Rogers endured extensive physical abuse and violence throughout his childhood and adolescence.  *See* R. 123-18 (Einstein Mem. at 1–2) (Page ID #24156–57); R. 123-19 (Einstein Mem. at 1–4) (Page ID #24159–62).  Reports of this abuse would have given a competent attorney additional reasons to suspect that Rogers had suffered brain injuries.  Counsel should have investigated further.  They did not.

All told, counsel had evidence that Rogers suffered at least four significant head injuries and may have suffered more. Counsel's own notes show they knew that they needed to obtain neurological evaluations and brain scans. And yet, they did not.[11] Instead, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527–28.

Trial counsel's conduct fell well below the prevailing norms at the time. Although ABA Guidelines are not "inexorable commands," they are "valuable measures of the prevailing professional norms of effective representation. *Padilla*, 559 U.S. at 367. The relevant ABA Guidelines provided that, in preparation for the sentencing phase, counsel should consider "[e]xpert witnesses to provide medical, psychological, sociological, or other explanations for the offense(s)." 1989 ABA Std. 11.8.3(F)(2). The 1992 Tennessee Association of Criminal Defense Lawyers Manual offered more detailed guidance, noting the importance of obtaining a "[p]sychological [d]iagnosis and [e]xpert [a]ssistance." R. 119-14 (Manual at 5.18) (Page ID #16403). It further explained:

> The first and most important [psychological explanation] is organic mental disorder, i.e., brain damage. If your client has had illnesses, accidents, or head injuries, . . . you must consider brain damage as a probable cause for his violent behavior. This means that the client must be evaluated by a neuropsychologist or neurologist . . . .

*Id.* at 5.18–5.19 (Page ID #16403–04). Because counsel should have pursued a neurological evaluation and brain scans, evaluating the evidence before the district court would necessarily lead to the conclusion that counsel's investigation into evidence of brain damage was deficient.

Abiding by the prevailing professional norms also would have led counsel to investigate more fully other mitigating evidence. The ABA Guidelines clearly established that an investigation into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence." 1989 ABA Std. 11.4.1(C). Among the witnesses who should be interviewed are "witnesses familiar with aspects of the client's life history that might affect . . .

---

[11]This case is thus unlike *Pike v. Gross*, 936 F.3d 372, 381–82 (6th Cir. 2019), in which an expert had tested the petitioner for brain damage prior to the sentencing phase and failed to find any signs of brain damage. Rogers's counsel failed *ever* to have an expert evaluate him for signs of brain damage.

possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death." *Id.* 11.4.1(D)(3)(B). Further, "Counsel should ensure that all reasonably available mitigating and favorable information consistent with the defense sentencing theory is presented to the sentencing entity or entities in the most effective possible way." *Id.* 11.8.2(D). Likewise, the 1992 Tennessee Association of Criminal Defense Lawyers Manual instructed that the defense team "must investigate . . . the client's entire life, including a search for all relevant institutional records and any individuals with information relevant to your client's life and your theory of mitigation." R. 119-14 (Manual at 4.4) (Page ID #16336).

The defense team was aware that further investigation would likely yield significant mitigating evidence, including evidence of abuse. *See* R. 118-20 (O'Brien Rep. at 9–20) (Page ID #14835–46). The defense team knew of at least 57 potential mitigation witnesses whom they failed ever to contact. *Id.* at 26 (Page ID #14852). For example, they failed to contact Rogers's biological father, Johnny Michelli, despite their knowledge that he—and not Laze Rogers—was likely Rogers's biological father and that Rogers suffered from a range of mental illnesses that could have hereditary components. R. 119-1 (Einstein Decl. ¶ 9) (Page ID #14907). They also failed to interview witnesses who could have painted a fuller picture of the abuse, violence, and trauma that Rogers endured throughout his life. *See* R. 118-20 (O'Brien Rep. at 26–32) (Page ID #14852–58).

When the defense team did contact witnesses, they failed to develop a strategy for presenting the witness testimony or prepare their witnesses. The lawyers did not work with the investigator to decide which witnesses would testify. R. 119-1 (Einstein Decl. ¶ 12) (Page ID #14907). As a result, witnesses felt that they were not prepared to testify. R. 111-5 (Page Decl. ¶ 52) (Page ID #13166); R. 113-7 (Miller Decl. ¶¶ 13–14) (Page ID #13721); R. 119-1 (Einstein Decl. ¶ 19) (Page ID #14908–09). Witnesses also felt that counsel had not given them the opportunity to explain the relevant evidence. *See* R. 112-6 (Sam Roger Decl. ¶ 120, 122) (Page ID #13596); R. 112-8 (Laze Rogers Decl. ¶ 71) (Page ID #13610).

Trial counsel "knew that the successful presentation of mitigation was crucial to securing Mr. Rogers a sentence less than death." R. 119-4 (Warner Decl. ¶ 14) (Page ID #14922); *see also* R. 123-4 (Gentry Decl. ¶ 7) (Page ID #24100). They were likewise aware that their

mitigation case was poor.  *See* R. 119-1 (Einstein Decl. ¶ 21) (Page ID #14910) (mitigation narrative "lacked structure" and "there was no sense of a larger story"); R. 123-4 (Gentry Decl. ¶ 11) (Page ID #24102) (mitigation investigation was "incomplete, inaccurate and . . . undeveloped").  The failure to investigate further "resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526.  At this juncture, we cannot say which of this evidence was properly before the federal habeas court, and we do not decide this issue. Nonetheless, the record that the district court considered contained overwhelming evidence that counsel's mitigation efforts were deficient.

### (2)  Prejudice Prong

Likewise, the record before the district court clearly revealed that Rogers was prejudiced by counsel's deficient performance.  "[P]rejudice exists if there is a reasonable probability that, but for his counsel's ineffectiveness, the jury would have made a different judgment about whether [Rogers] deserved the death penalty as opposed to a lesser sentence." *Andrus*, 140 S. Ct. at 1885–86.  This inquiry "will necessarily require a court to 'speculate' as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears v. Upton*, 561 U.S. 945, 956 (2010) (per curiam).  "[B]ecause [Rogers's] death sentence required a unanimous jury recommendation . . . , prejudice here requires only 'a reasonable probability that at least one juror would have struck a different balance' regarding [Rogers's] moral culpability." *Andrus*, 140 S. Ct. at 1886 (quoting *Wiggins*, 539 U.S. at 537–38).

"[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Foust*, 655 F.3d at 539 (quoting *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005)).  "[T]he failure to present additional mitigating evidence that is 'merely cumulative' of that already presented does not rise to the level of a constitutional violation." *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006) (quoting *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005)).  Although the new evidence cannot be cumulative with the evidence that had been presented to the jury, the Supreme Court has made clear that it has "never limited the prejudice inquiry under

*Strickland* to cases in which there was only 'little or no mitigation evidence' presented." *Sears*, 561 U.S. at 954.

At the penalty phase, ten mitigation witnesses testified: Rogers's sibling, Sam; Rogers's presumed father, Laze Rogers; five other lay witnesses; a social worker; a psychologist; and a psychiatrist. These witnesses testified that Rogers was severely abused as a child. This evidence, however, pales in comparison to the "tidal wave" of available mitigating evidence. *Andrus*, 140 S. Ct. at 1887. The mitigation evidence presented in the district court differed in strength and subject matter from the evidence that was presented at sentencing and, "rather than being cumulative . . . , provides a more nuanced understanding of [Rogers's] psychological background and presents a more sympathetic picture of Rogers." *Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008).[12]

### (a) Brain Damage

The evidence of Rogers's brain damage that was before the district court was substantially stronger than the evidence that was actually presented at the penalty phase of Rogers's trial. The district court learned that Rogers suffers from "neuropsychological impairments" that "significantly hinder his adaptive functioning in the real world, in that he is far less able to regulate his emotions, control his impulses, think quickly and efficiently, respond appropriately to changing stimulus demands, and consider long-term consequences of his actions." R. 113-19 (James Report at 1) (Page ID #13952). The neuropsychological evaluation connected evidence of additional head injuries that contributed to these impairments, including, among others: "severe beatings by his stepfather that resulted in loss of consciousness on several occasions"; "a specific incident which occurred at the age of 10, when his stepfather hit him in the back of the head with an aluminum bat" causing him to "los[e] consciousness for about four

---

[12]For the purposes of analyzing whether this evidence is cumulative, we break up this evidence by subject matter, rather than going claim-by-claim. We do this for ease of analysis because many categories of evidence are relevant to multiple of Rogers's claims. For example, various types of abuse impacted the mitigation narrative, shaped his experiences of complex trauma, and contributed to his brain damage. We note, however, that these claims are relevant in the context of counsel's failure to present mitigation evidence in the four categories that Rogers lists in his habeas petition, which relate to: (1) the mitigation narrative; (2) the brain damage stemming from the torture that he suffered at the hands of his stepfather; (3) the complex trauma that he experienced; and (4) evidence regarding his biological father's family.

hours," "experience[] dizziness and poor balance for approximately two weeks after this incident," and "have throbbing headaches"; and being "hit in the head by a metal bar during a prison riot" and "awaking . . . four to five days later." *Id.* at 3 (Page ID #13954). The neuropsychological evaluation confirmed that Rogers's history of abuse directly contributed to his neurological impairments. *Id.* at 10 (Page ID #13961).

Testing also confirms that Rogers suffers from organic brain damage. Together, the behavioral imaging data and structural and functional imaging "converge to show abnormalities indicating brain damage . . . in regions that are very important for regulating behavior and emotions, communication, social cognition and conflict resolution." R. 114-7 (Gur Report at 4) (Page ID #14032). The MRI and PET scans show multiple deficiencies that are clinically significant; these deficiencies are not independent of each other but interact in a way that significantly impeded Rogers's ability to regulate his behaviors. For example, the scans show that he has a damaged amygdala which "will misinterpret danger signals and when excited, will issue false alarms that require intact frontal components of the limbic system for modulation." *Id.* His frontal lobe, however, is "unable to exercise control as a normal one would, because his 'thinking brain' is not only damaged but is already operating at full capacity in its hyper-vigilant state," which makes it "unable to . . . act as the brakes on the primitive emotional impulses emanating from the amygdala when the limbic system reaches its activated stage." *Id.* Because his brain's default state is one of "hyper-vigilance," it responds to situational demands with "increased limbic activity associated with reduced cortical activity," leading to a "lower threshold for impulsive behavior and reduced capacity to consider its context." *Id.* at 5 (Page ID #14033).

The brain-damage evidence that was before the district court was not "'merely cumulative' of that already presented" during Rogers's original sentencing. *Broom*, 441 F.3d at 410. *No* evidence of brain damage was presented to the jury at the penalty phase of Rogers's trial. The only discussion of brain damage was Neilson's statements that trauma "*can* have a profound impact and even a permanent impact in how the brain functions." R. 25-14 (Tr. at 272) (Page ID #5544) (emphasis added). This testimony, however, was presented purely in the abstract, and there was no evidence that Rogers *did* suffer any such brain damage. The evidence

of brain damage presented to the district court thus differed "in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Broom*, 441 F.3d at 410 (quoting *Clark*, 425 F.3d at 286); *see also Sears*, 561 U.S. at 956; *Rompilla v. Beard*, 545 U.S. 374, 392–93 (2005).

### (b)  Evidence of Abuse

Likewise, Rogers presented to the district court additional significant evidence of the abuse that Rogers suffered that was not merely cumulative.  This included evidence of abuse that Rogers suffered at juvenile facilities, evidence of sexual abuse, and additional evidence of physical abuse.

Rogers was confined at three different institutions in his adolescence:  Mizpah's Home for Boys (age 12); LTI (age 16); and Oakley Correctional Facility (age 17).  Although Guin testified about the conditions at LTI generally and that Rogers witnessed abuse there, no evidence at the penalty phase showed (1) that Rogers directly experienced significant abuse at LTI; or (2) that Rogers both suffered and witnessed significant abuse at the other two institutions.[13]  As a result, evidence showing that Rogers experienced this abuse was not merely cumulative.  It likewise differed significantly in strength and subject matter from the testimony that his stepfather abused him because it showed that Rogers was under constant threat of abuse and endured abuse that was different in kind from what his stepfather inflicted.

---

[13]He did, however, experience such abuse.  Rogers presents evidence that, at Mizpah, Rogers and the other boys were badly beat as punishment, leaving "welts" and "real dark bruises."  R. 114–16 (LaPointe Decl. at ¶ 5) (Page ID #14117–18).  An individual who had been confined there with Rogers "remember[ed] that the Reverend constantly beat one kid for wetting his bed" and "believe[d] that kid was Glenn."  *Id.* ¶ 7 (Page ID #14118).  Rogers also offers witness testimony that, at LTI, the guards beat Rogers "quite a few times," and Rogers was sent to the infirmary twice.  *Id.* ¶ 21 (Page ID #14119).  The abuse at LTI was far beyond what Guin described to the jury:  the guards beat the boys with shovel handles and chains, made them strip and whipped them.  *Id.* ¶¶ 20–21 (Page ID #14119).  Physical and sexual abuse were common, and, among the other abuse, Rogers witnessed a group of boys setting another boy on fire at night.  *Id.* ¶¶ 20–37 (Page ID #14119–22).  He suffered further abuse at Oakley:  someone with whom Rogers ran away reported that, while at Oakley, he "witnessed and heard boys rape and beat other kids . . . at least three times a week."  R. 115-15 (Barrett Decl. ¶ 6) (Page ID #14206).

Further, counsel presented little evidence of sexual abuse at trial.[14] Yet, such evidence is significant.  Rogers was often in the same room as Sam during the times that their stepfather's brother repeatedly sexually abused Sam.  R. 112-6 (Sam Roger Decl. ¶ 78) (Page ID #13589); *see also id.* ¶¶ 70, 73–77 (Page ID #13588–89); R. 113-4 (Dempsey Decl. ¶¶ 35–36) (Page ID #13700).  Another aunt allowed her boyfriend to sexually abuse Sam.  R. 112-6 (Sam Roger Decl. ¶ 114) (Page ID #13595).  This evidence is particularly relevant because multiple witnesses described Sam as Rogers's protector and a parental figure to Rogers.  Rogers may also have suffered sexual abuse directly:  Sam suspected that a neighbor who sexually abused her also sexually abused Rogers.  *Id.* ¶ 6 (Page ID #13578).

Finally, additional evidence of physical abuse that was before the district court was sufficiently different from the evidence of physical abuse that was presented at trial so as not to be cumulative.  At trial, there was evidence that Rogers's stepfather beat him and chained him to his bed.  First, additional evidence before the district court showed that his stepfather had further sadistic tendencies, such as breaking their pet dog's neck, R. 112-6 (Sam Roger Decl. ¶ 43) (Page ID #13584), and inflicted violent beatings beyond the scope of what had been described to the jury, *id.* at 6 (Sam Roger Decl. ¶ 30) (Page ID #13582) ("I saw Big Danny beating Glenn with a tether pole.  Glenn's face was nearly unrecognizable because of all of the blood.").  Second, the evidence presented to the jury painted a picture in which Rogers's stepfather was abusive, and his mother did not intervene.  Evidence that suggested his mother—and not just his stepfather—abused him was not merely cumulative.  *See* R. 112-6 (Sam Roger Decl. ¶ 48) (Page ID #13585); R. 111-5 (Page Decl. ¶ 29) (Page ID #13162).

### (c)  Evidence of Mental Illness

Additional evidence of mental illness that the district court heard was likewise not merely cumulative.  This included evidence of a significant family history of mental illness, Rogers's history of depression, and accounts of Rogers's multiple personalities.

---

[14]There were only four pieces of evidence related to sexual abuse presented at the penalty phase: (1) Sam's testimony that Sam suspected Rogers's stepfather forcibly gave Rogers enemas, R. 25-13 (Tr. at 133–36) (Page ID #5404–07); (2) a possible reference by Rogers's aunt to sexual abuse (no audible answer was transcribed), R. 25-15 (Tr. at 26) (Page ID #5684); and (3) Neilson's and Caruso's passing references to their understanding that Rogers suffered sexual abuse.  R. 25-14 (Tr. at 260) (Page ID #5532); R. 25-16 (Tr. at 158) (Page ID #5822).

Although evidence of Rogers's mental illness was presented to the jury at the mitigation phase of his trial, no evidence showed a significant family history of mental illness. This family history includes history on Rogers's father's side. The defense did not present any evidence that Johnny Michelli was Rogers's biological father. R. 111-22 (Michelli Decl. ¶ 1) (Page ID #13392). His father's side of the family has an extensive history of severe mental-health issues, including bipolar disorder, schizoaffective disorder, various personality disorders, schizophrenia, anxiety, depression, paranoia and drug addiction. *Id.* ¶¶ 48–51 (Page ID #13402–03); R. 116-15 (Connie Michelli Medical Report at 3) (Page ID #14423); R. 116-16 (Connie Michelli Disability Determinations at 4) (Page ID #14428); R. 116-25 (Angela Michelli Psychological Consult) (Page ID #14500–03); R. 117-4 (Allen Michelli Sentencing Hr'g at 135–36) (Page ID #14541–42). His sibling Sam also suffered from significant mental illness that, in many ways, paralleled what Rogers suffered. Sam had multiple suicide attempts, both in childhood and adulthood, and has been confined in multiple mental hospitals. R. 112-6 (Sam Roger Decl. ¶¶ 88–94) (Page ID #13591–92). Like Rogers, Sam suffers from Dissociative Identity Disorder and has multiple identities and blackouts. *Id.* ¶¶ 94–97 (Page ID #13592). Unlike the evidence that was actually presented at the penalty phase of Rogers's trial, this evidence showed that Rogers's mental illnesses are part of a long family history.

Additionally, the district court was presented with evidence of Rogers's depression and history of suicidal thoughts that was not merely cumulative. This evidence showed that Rogers suffered significant depression and suicidal thoughts from the time he was a child. *See* R. 112-6 (Sam Roger Decl. ¶ 25) (Page ID #13581) (significant depression around the age of nine); R. 113-12 (LTI Progress Notes at 1) (Page ID #13815) (suicidal thoughts as a teenager). This evidence was different in strength and subject matter from the testimony that Neilson gave at trial: that he diagnosed Rogers with depressive disorder, but "wasn't sure that [Rogers's] depression had been chronic enough" to qualify as dystonic disorder, meaning that he was not sure it had been "pretty consistent for at least two years." R. 25-14 (Tr. at 295) (Page ID #5567). Significant, nearly lifelong depression was substantially different from the type of depression that Neilson explained to the jury.

Finally, the evidence presented to the district court about Rogers's different personalities was not cumulative with Neilson's diagnosis of dissociative disorder not otherwise specified. At the penalty phase, Neilson stated that Rogers dissociates and showed an example of a letter that Rogers wrote saying he has other personalities. R. 25-14 (Tr. at 300–04) (Page ID #5572–76). There was no evidence, however, of what these other personalities looked like or how they acted differently. Such evidence is substantially different from Neilson's clinical description of an unspecified dissociative disorder. Evidence that shows the scope of these different personalities and how these personalities acted would thus not have been cumulative. *See* 112-6 (Sam Roger Decl. ¶¶ 99–100) (Page ID #13593); R. 112-8 (Lazarus Rogers Decl. ¶¶ 48, 54) (Page ID #13606–08); R. 116-4 (Paul Sandifer Decl. ¶¶ 5–17) (Page ID #14313–14); R. 116-5 (Veronica Sandifer Decl. ¶¶ 4– 11, 15–17) (Page ID #14316–17).

The district court had before it overwhelming evidence that these claims were substantial. A court able to consider that evidence could have no doubt that trial counsel's investigation into this mitigation evidence was deficient or that trial counsel's failure to investigate the avalanche of mitigating evidence prejudiced Rogers. Throughout his childhood, Rogers experienced unimaginable abuse at the hands of nearly every adult who was supposed to be responsible for him. As a result of abuse, complex trauma, and significant head injuries, Rogers suffers from serious brain damage. We would be hard pressed to envision a more compelling mitigation narrative, and if we were evaluating the record before the district court, we would have no doubt that an adequate investigation into and presentation of the available mitigation evidence would have shaped the jury's assessment of the aggravating and mitigating factors.

Again, however, in light of *Shinn v. Ramirez*, we do not decide whether this ineffective-assistance claim is substantial. Instead, we vacate the aspects of the district court opinion with respect to the mitigation claims. Our grant of habeas corpus at the penalty phase on Claim C.12 (ineffective assistance for failing adequately to challenge the semen evidence) entitles Rogers to resentencing in state court, and resentencing eliminates the need for the district court to consider the mitigation claims on remand.

### 3. Opening the Door to Evidence of Prior Escape (Claims E.12–13)

Rogers next argues that counsel was ineffective in presenting evidence from Dr. Mark Cunningham at the penalty phase because Cunningham's testimony opened the door to otherwise inadmissible evidence related to Rogers's prior escape from prison and the potential for future escape. This claim was not presented in state court. The *Martinez-Trevino* exception does not excuse Rogers's procedural default with respect to this claim because it is not substantial.

Cunningham's testimony focused on "the area of risk assessment with capital convicts." R. 25-16 (Tr. at 188) (Page ID #5852). Before Cunningham testified, outside the presence of the jury, the court made clear that counsel was aware of the implications of permitting Cunningham to testify. The trial court stated that "it opens up the counter strike, so to speak." *Id.* at 200 (Page ID #5864). The prosecution stated, "if they want to talk about there is no future dangerousness in prison, the possibility of not being in prison is also an issue that should be raised," and the court clarified it would "let them have a wide open cross examination." *Id.* at 201 (Page ID #5865). The prosecution further stated that they would "be asking their expert . . . have you reviewed [Rogers's] prison records from Florida Department of Corrections" and whether he is "aware that [Rogers] has a felony escape conviction from a Florida prison." *Id.* The court asked defense counsel, "I assume y'all know about that too?" and defense counsel replied "Yes, I have seen that." *Id.*

Despite this risk, counsel chose to call Cunningham as a witness and ask about the risk of future dangerousness. During the post-conviction hearing, counsel testified that the purpose of introducing this testimony was to show that Rogers was unlikely to be violent in the future because future dangerousness was a mitigating factor under the federal statutes at the time. R. 26-9 (Tr. at 129) (Page ID #8200).

The *Strickland* standard is "highly deferential," *Strickland*, 466 U.S. at 689, and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.*

In this case, counsel's strategy "did not work out as well as hoped" but that does not mean "that counsel was incompetent." *Richter*, 562 U.S. at 109. As a result, Rogers failed to show that his claim is substantial such that it falls within the *Martinez-Trevino* exception to procedural default.

### 4. Ineffective Assistance of Counsel at Motion-for-a-New-Trial Stage (Claim F.3)

Finally, Rogers argues that his counsel was ineffective by failing to raise certain arguments in the motion for a new trial. Those arguments pertain to both the guilt/innocence phase and the penalty phase. Rogers never raised this claim in state court, and it was thus procedurally defaulted. The *Martinez-Trevino* exception can excuse procedural default when a petitioner claims that *trial* counsel was ineffective. *Martinez*, 566 U.S. at 17. It cannot apply, however, when a petitioner claims that *appellate* counsel was ineffective. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017). Neither the Sixth Circuit nor the Supreme Court has addressed whether the *Martinez-Trevino* exception can apply when the underlying ineffective assistance occurred in a motion for a new trial.

Several courts have addressed whether the *Martinez-Trevino* exception applies to ineffective-assistance-of-post-sentencing-counsel claims, but these courts have arrived at different answers. The Third Circuit held that, on federal habeas review, a federal court may consider a defaulted claim that a post-sentencing lawyer was ineffective. *Richardson v. Superintendent Coal Twp. SCI*, 905 F.3d 750, 756 (3d Cir. 2018). The Third Circuit reasoned that "the line dividing trial from appeal falls naturally at the notice of appeal" and because "[p]ost-sentencing motions precede the notice of appeal, . . . they fall on the trial side of the line." *Id.* The Third Circuit further explained that "[s]entencing and post-sentencing proceedings also differ categorically from appeals" because "[c]ounsel direct sentencing and post-sentencing arguments to the same trial court," and post-sentencing counsel "may also develop the record by proffering new evidence, which the trial court may hear at an evidentiary hearing." *Id.* at 761. It also determined that the equitable principles in *Martinez* apply when the underlying ineffective-assistance claim relates to a post-sentencing proceeding because "[m]any states do not entertain ineffective-assistance claims on direct appeal." *Id.* at 762. Declining to apply the *Martinez-Trevino* exception to these claims would thus "prevent state and federal

courts from ever looking at meritorious ineffective-assistance-of-post-sentencing-counsel claims." *Id.*

In contrast, the Fifth Circuit and several district courts in this circuit have arrived at the opposite answer. In a nonprecedential opinion and without further analysis, the Fifth Circuit held that a federal court could not hear a petitioner's claim that "appellate counsel was ineffective for failing to raise [certain claims], in a motion for new trial or on direct appeal," *Milam v. Davis*, 733 F. App'x 781, 782 (5th Cir. 2018) (per curiam), because "the Supreme Court has held that *Martinez* does not extend to ineffective assistance of appellate counsel claims," *id.* at 786 (citing *Davila*, 137 S. Ct. at 2065). Likewise, several district courts in this circuit have found that *Martinez* does not apply to IAC claims related to a motion for a new trial. *See Johnson v. Genovese*, No. 3:18-cv-00539, 2021 WL 3269954, at *18 (M.D. Tenn. July 30, 2021) (*Martinez-Trevino* exception did not apply to claim of ineffective assistance of counsel when counsel omitted arguments from a motion for a new trial because it was a "claim[] of post-trial ineffectiveness"); *Petty v. Hampton*, No. 3:18-cv-00576, 2020 WL 3964207, at *17 (M.D. Tenn. July 13, 2020) (explaining that "*Martinez* does not apply because this entire claim concerns the alleged ineffective assistance of counsel in connection with a motion for a new trial" because a convicted and sentenced defendant is no longer presumptively innocent and because *Martinez* should be not read overly broadly). Although at least one court has mentioned that it is "unclear" if the *Martinez-Trevino* exception applies to claims that counsel was ineffective during the motion for a new trial, *Esposito v. Humphrey*, No. 5:12-cv-163, 2014 WL 7003770, at *34 (M.D. Ga. Dec. 10, 2014), several other district courts have suggested that this exception does not apply in this context, *see Reese v. Liberty*, No. 1:13-cv-00077-NT, 2018 WL 442998, at *12 (D. Me. Jan 16, 2018) ("The limited exception in *Martinez* does not apply to Petitioner's claims of ineffective assistance in the motion for a new trial, which the Law Court has characterized as a post-conviction motion."); *Bourdon v. Goings*, No. 15-cv-138-LM, 2016 WL 7480266, at *2 (D.N.H. Nov. 30, 2016) (*Martinez* exception does not apply to ineffective-assistance claims related to a motion for a new trial because a "motion for a new trial is properly characterized as a 'post-conviction' proceeding that is 'collateral' in nature for the purposes of § 2254(i)").

We are persuaded by the Third Circuit's analysis and hold that, in Tennessee, the *Martinez-Trevino* exception can excuse procedural default when the underlying claim relates to ineffective assistance of counsel at the motion-for-a-new-trial stage.

First, as the Third Circuit explained was true in Pennsylvania, motions for a new trial in Tennessee courts "differ categorically from appeals." *Richardson*, 905 F.3d at 761. In a motion for a new trial, the court may allow new testimony from witnesses. Tenn. R. Crim. P. 33(c)(1). Motions for a new trial go before the same court that presided over the trial. *See id.* 33(a). These similarities suggest that claims stemming from a motion for a new trial are more similar to claims that trial counsel was ineffective than claims that appellate counsel was ineffective.

Second, as the Third Circuit explained, the notice of appeal is the appropriate transition point between trial and appeal. In Tennessee, the filing of a notice of appeal is addressed jointly by the Rules of Criminal Procedure and the Rules of Appellate Procedure. *See* Tenn. R. Crim. P. 37(d)(1) (instructing the defendant to "file a timely notice of appeal with the clerk in accordance with Rule 4(a), Tennessee Rules of Appellate Procedure); Tenn. R. App. P. 3–4. A motion for a new trial is treated as separate from the appeals process. *See Fahey v. Eldridge*, 46 S.W.3d 138, 141 (Tenn. 2001) ("[I]n order to preserve errors for appeal, the appellant must first bring the alleged errors to the attention of the trial court in a motion for a new trial.").

Additionally, the equitable considerations that guided the decisions in *Martinez* and *Trevino* apply with equal force to ineffective-assistance claims related to a motion for a new trial. The Supreme Court recognized that the situation in *Martinez* necessitated an exception to ensure that the underlying ineffective-assistance claim "will have been addressed by one court." 566 U.S. at 11. *Davila* used this ground to differentiate ineffective-assistance-of-*trial*-counsel claims from ineffective-assistance-of-*appellate*-counsel claims, explaining that, unlike in an ineffective-assistance-of-trial-counsel claim, when a claim relates to ineffective assistance of appellate counsel, "at least 'one court' will have considered the [underlying trial error] on the merits." 137 S. Ct. at 2067 (quoting *Martinez*, 566 U.S. at 11). This is because if "trial counsel preserved the error by properly objecting," but appellate counsel dropped the ball, then "that claim of trial error 'will have been addressed by . . . the trial court." *Id.* (quoting *Martinez*, 566 U.S. at 11). But "[i]f an unpreserved trial error was so obvious that appellate counsel was

constitutionally required to raise it on appeal, then trial counsel likely provided ineffective assistance by failing to object to it in the first instance," and "the prisoner likely could invoke *Martinez* or *Coleman* to obtain review of trial counsel's failure to object." *Id.* at 2067–68.

If the *Martinez* exception does not apply to claims that counsel was ineffective on a motion for a new trial in Tennessee, certain claims may never be heard. This is because, in Tennessee, motions for a new trial are the preferred procedural mechanism for bringing trial errors to the attention of the trial court. To preserve an issue for appellate review, trial counsel[15] not only must raise an objection at trial but also must renew that objection to the trial judge in a motion for a new trial within thirty days of sentencing. Tenn. R. App. P. 3(e); Tenn. R. Crim. P. 33(b); *State v. Harbison*, 539 S.W.3d 149, 164–65 (Tenn. 2018) ("Grounds not raised in a motion for a new trial are waived for the purposes of appeal."). The Tennessee Supreme Court has recognized that motions for a new trial ensure "that the trial judge might be given an opportunity to consider or to reconsider alleged errors committed during the course of the trial or other matters affecting the jury or the verdict . . . which either occurred after the trial or could not reasonably have been discovered until after the verdict." *McCormic v. Smith*, 659 S.W.2d 804, 806 (Tenn. 1983). Motions for a new trial in Tennessee preserve the trial objections and are the mechanism by which trial counsel are expected to allow the "trial court" to address claims of "trial error." *See Davila*, 137 S. Ct. at 2067. If counsel is ineffective at this stage, all trial issues will be waived. Tenn. R. App. 3(e); *see also Harbison*, 539 S.W.3d at 164. Accordingly, applying the *Martinez-Trevino* exception to ineffective-assistance claims at the Tennessee motion-for-a-new-trial stage in this context is necessary to ensure that all of a defendant's trial claims can be heard in at least one court.

The counterarguments are not persuasive. First, the district court repeatedly emphasized the *Martinez* exception is "narrow." *Rogers IV*, 2019 WL 1331035 at *100–01, 116. *Davila* cautioned against expanding *Martinez* to other types of claims. 137 S. Ct. at 2067. We are not, however, expanding the *Martinez-Trevino*'s exception to a new category of cases. Rather, we

---

[15]As we explained in *Sutton*, "[i]n a typical Tennessee case, it is likely that trial counsel *will* file the motion for new trial because Tennessee requires appointed trial counsel to continue representation throughout a defendant's direct appeal, and permits withdrawal only on a showing of good cause." 745 F.3d at 793 (footnote omitted) (citing Tenn. Sup. Ct. Rule 13(e)(5); Tenn. Code Ann. § 40-14-205(a)).

are clarifying that claims of ineffective assistance at the Tennessee motion-for-a-new-trial phase fit neatly within the larger bucket of trial claims, which are already recognized as within the scope of the *Martinez-Trevino* exception.

Additionally, the district court suggested that the *Martinez-Trevino* exception does not apply in this circumstance because, at the motion-for-a-new-trial stage, a defendant no longer is presumed innocent. *Rogers IV*, 2019 WL 1331035, at *101; *see, e.g.*, *Johnson v. Genovese*, 2021 WL 3259954, at *18; *Petty*, 2020 WL 3964207, at *17. The *Martinez-Trevino* exception, however, indisputably applies to cases involving ineffective assistance at the sentencing phase. *See Trevino*, 569 U.S. at 417–18 (applying *Martinez* in a case involving ineffective assistance at the penalty phase of a trial). Yet, the presumption of innocence does not apply at the sentencing phase because "[o]nce the defendant has been convicted fairly in the guilt phase of the trial, the presumption of innocence disappears." *Delo v. Lashley*, 507 U.S. 272, 278 (1993) (per curiam). *Trevino* thus illustrates that a defendant's presumptive innocence is not determinative of whether the *Martinez-Trevino* exception may apply.

In a state such as Tennessee, the *Martinez-Trevino* exception applies to claims that counsel was constitutionally ineffective on a motion for a new trial. Unlike with some of Rogers's other claims, the claims related to ineffective assistance of counsel at the motion-for-a-new-trial stage relate to both the guilt/innocence phase and to the penalty phase. Thus, although our grant of habeas corpus at the penalty phase on Claim C.12 entitles Rogers to resentencing and means that, on remand, the district court need not consider any other issues related to the penalty phase, it must still resolve those issues that pertain to the guilt/innocence phase. On remand, the district court should evaluate whether Rogers presented a substantial claim and satisfies the remaining factors needed to excuse his procedural default. If so, the district court should proceed to resolve the claim of ineffective assistance on the motion for a new trial.

### III. CONCLUSION

For the reasons articulated above, we **AFFIRM** the district court's denial of habeas with respect to Rogers's sufficiency-of-the-evidence claims (Claims G.39, I.5, I.8–11), claims regarding the exclusion of cross-examination and evidence regarding prior sexual acts between

the victim and her brother (Claims G.21–24, G.26, G.44), and claims that counsel was ineffective by opening the door to evidence of prior escape (Claims E.12–13). We **REVERSE** the district court's denial of habeas on Rogers's claim that trial counsel's failure adequately to challenge the semen evidence was constitutionally ineffective (Claim C.12) and **REMAND** with instructions to grant habeas on this claim as to the penalty phase. We **VACATE** the district court's findings that Rogers failed to overcome his procedural default on (1) his claims that counsel was ineffective in failing to investigate the victim's brother as a source of the semen (Claims C.8, D.26) and (2) his mitigation claims (C.20–23, E.2–5). Finally, we **REVERSE** the district court's finding that the *Martinez-Trevino* exception cannot excuse the procedural default when the underlying ineffective assistance occurred in a motion for a new trial and **REMAND** with instructions to determine whether Rogers can overcome his procedural default of this claim (Claim F.3).

———————————————————————————

**CONCURRING IN PART AND DISSENTING IN PART**

———————————————————————————

HELENE N. WHITE, Circuit Judge, dissenting from sections II.B.3.b.2, II.C.1, and II.C.2.b, and otherwise concurring.

I do not agree that Rogers was prejudiced at the penalty-phase by counsel's failures regarding the sperm evidence. In assessing prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984), we determine whether, but for counsel's ineffectiveness, the likelihood of a different outcome would have been "substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

Rogers has not shown that there was a "substantial" likelihood that the jury would have imposed a different penalty if counsel had been effective in challenging the quality of the sperm evidence or the source of the sperm. Even assuming that some combination of the washing-machine/Jeremy evidence and the additional serological evidence would have affected the rape conviction,[1] the evidence could not have disturbed the jury's verdict convicting Rogers of felony-murder-in-perpetration-of-kidnapping, with which the conviction for felony-murder-in-perpetration-of-rape was merged. R. 24-5 (Order) (Page ID #1142). And, as the majority acknowledges, disturbing the rape conviction would not eliminate the four statutory aggravating factors that the jury found in Rogers's case, only one of which is required to impose the death penalty. Tenn. Code Ann. § 39-13-204(i) (1996). And while the majority argues that there is a "reasonable probability" the jury might have weighed the factors differently without a formal rape conviction—admittedly the most powerful aggravating fact—the jury would still have been confronted with the premeditated and calculating kidnapping and murder of a 9-year-old whose shirt had been removed and whose shorts contained sperm in the inside crotch—albeit from an

———————————————————————————

[1]I note that neither the additional serological evidence nor the Jeremy evidence would have rendered the sperm evidence inadmissible. As the state court noted, the new evidence would have only impacted the "weight" of the sperm evidence. *Rogers III*, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *47 (Tenn. Crim. App. Aug. 30, 2012).

unknown source.  These facts, in and of themselves, and without conclusive evidence of rape, are highly inflammatory and disturbing.

Further, the jury knew that the serology evidence was largely inconclusive and could not be directly tied to Rogers, *Rogers III*, 2012 WL 3776675, at *46, but sentenced Rogers to death anyway.  *Id.* at *47.  Although it is "conceivable" that the new evidence further weakening the sperm evidence could have persuaded the jury to render a different penalty, I cannot agree, on these facts and with the statutory aggravating factors undisturbed, that the likelihood of a different penalty was "substantial" but for counsel's errors.  *Harrington*, 562 U.S. at 112.

Finally, regarding sections II.C.1 and II.C.2.b, I am in complete agreement with the majority's assessment of the evidence introduced for the first time in district court on *Martinez-Trevino* review of the claims of IAC at the penalty phase.  Nevertheless, the Supreme Court's recent decision in *Shinn v. Ramirez*, 142 S. Ct. 1718, 1734 (2022), bars our consideration of this evidence, as compelling as it may be.

I concur in the majority opinion in all other respects.